811 A.2d 530

COMMONWEALTH of Pennsylvania, Appellee,

v.

Albert E. REID, Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 14, 2001.

Decided Sept. 30, 2002.

Reargument Denied Dec. 30, 2002.

2

4

8

David Russell Yoder, Chambersburg, for Albert Ezron Reid.

John F. Nelson, Chambersburg, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION OF THE COURT*

Justice NIGRO.

On October 9, 1998, a jury found Appellant Albert E. Reid guilty of one count of burglary [1] and two counts of first-degree murder [2] for killing his estranged wife, Carla Reid, and her fourteen-year-old daughter from a previous relationship, Deidra Moore. After a penalty hearing, the jury found that the evidence supported three aggravating circumstances and one mitigating circumstance with regard to Appellant's first-degree murder conviction for the death of Carla Reid and three aggravating circumstances and one mitigating circumstance with regard to Appellant's first-degree murder conviction for the death of Deidra Moore.[3] The jury then determined that

1. 18 Pa.C.S. § 3502.
2. 18 Pa.C.S. § 2502(a).
3. The three aggravating circumstances found by the jury with regard to the murder of Carla were that: Appellant killed Carla in order to prevent her from testifying as a prosecution witness in a criminal proceeding in which Appellant was charged with committing a felony, namely the pending aggravated indecent assault charges, 42 Pa.C.S. § 9711(d)(5); Appellant killed Carla in the course of a felony (burglary), *id.* § 9711(d)(6); and Appellant was convicted of the first-degree murder of Deidra, which he committed at the time he committed the first-degree murder of Carla, *id.* § 9711(d)(10). The single mitigating cir-

for each of Appellant's first-degree murder convictions, the three aggravating circumstances outweighed the single mitigating circumstance, and therefore, returned two sentences of death against Appellant. On October 21, 1998, the Court of Common Pleas of Franklin County ("trial court") formally imposed two death sentences against Appellant.[4] Appellant subsequently filed post-sentence motions, which the trial court denied on May 27, 1999. Appellant now appeals from the trial court's judgment sentencing him to death for both the first-degree murder of Carla Reid and Deidra Moore.[5] For the reasons that follow, we affirm Appellant's judgment of sentence.

■■■■ As Appellant has been sentenced to death, we must review the record to determine whether the Commonwealth has established the elements necessary to sustain Appellant's convictions for first-degree murder. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 (1982).[6] In reviewing whether the evidence is sufficient to support a first-degree

cumstance found by the jury with regard to the death of Carla was that Appellant had no significant history of prior criminal convictions, *id.* § 9711(e)(1).

Likewise, the three aggravating circumstances found by the jury with regard to the murder of Deidra were that: Appellant killed Deidra in order to prevent her from testifying as a prosecution witness in the scheduled criminal proceeding in which Appellant was charged with the felony offense of aggravated indecent assault, *id.* § 9711(d)(5); Appellant killed Deidra in the course of a felony (burglary), *id.* § 9711(d)(6); and Appellant was convicted of the first-degree murder of Carla, which he committed at the time he committed the first-degree murder of Deidra, *id.* § 9711(d)(10). The jury also found the same mitigating circumstance existed with regard to Appellant's first-degree murder conviction of Deidra that it found for Appellant's first-degree murder conviction of Carla, that Appellant had no significant history of prior criminal convictions, *id.* § 9711(e)(1).

4. In addition, Appellant was sentenced to a concurrent sentence of ten to twenty years in prison for his burglary conviction.

5. Pursuant to 42 Pa.C.S. § 9711(h), a sentence of death is subject to automatic review by this Court.

6. Although Appellant does not challenge whether the evidence was sufficient to support his convictions for first-degree murder, we are required to review the sufficiency of the evidence in a case such as this, where the appellant has been sentenced to death. *Id.*

murder conviction, we must review the evidence in the light most favorable to the Commonwealth, as the verdict winner, to determine whether the jury could have found every element of the crime beyond a reasonable doubt. *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 135 (2001). To convict a defendant of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant intentionally killed another human. 18 Pa.C.S. § 2502(a). A defendant intentionally kills another if the killing was willful, deliberate, or premeditated. *Id.* § 2502(d). The Commonwealth may establish that a defendant intentionally killed another solely by circumstantial evidence, and the fact finder may infer that the defendant intended to kill a victim based on the defendant's use of a deadly weapon on a vital part of the victim's body. *Rivera,* 773 A.2d at 135.

Here, there was clearly sufficient evidence to support Appellant's first-degree murder convictions. The evidence adduced at trial establishes that Appellant and Carla Reid had a tumultuous relationship.[7] According to friends and acquaintances of both Appellant and Carla, Appellant was controlling of and abusive toward Carla.[8] Several Pennsylvania State

---

**7.** Appellant and Carla began living together in approximately 1991 and eventually were married.

**8.** Donnie A. Williams, a bouncer at the Madden Hotel bar, testified that he often saw Appellant and Carla arguing at the bar and at times, Appellant would slap Carla. N.T., 10/7/98, at 291. Lisa Gardner, Carla's sister, testified about several fights she observed between Appellant and Carla. One such fight occurred at the Madden Hotel bar when Appellant argued with Carla because Carla was speaking to other men. N.T., 10/6/98, at 242–43. Ms. Gardner stated that she and Carla then left the bar in Carla's car to go to a friend's house and Appellant followed them. *Id.* According to Ms. Gardner, as she tried to enter her friend's house, Appellant grabbed her, put a knife to her throat, and told Carla that he would kill Ms. Gardner and then kill Carla. *Id.*

Carla's friends, Diana Brown, Donna Ferguson, Candy Williams, and Ruby Murray, additionally testified to incidents they witnessed between Appellant and Carla. Diana Brown told the court that once when she was working as a bartender at a local bar, Carla came in the bar and asked her to keep a look out for Appellant. *Id.* at 266. According to Ms. Brown, about a half hour after Carla entered the bar, Appellant appeared and physically forced Carla to leave the bar. *Id.* Donna Ferguson testified that on one occasion she was at the Madden Hotel bar with Carla when Appellant approached Carla and asked her to

Police troopers from Chambersburg, Pennsylvania, testified that between 1990 and 1993, they each filed charges of terroristic threats, simple assault, or harassment against Appellant, though those charges were subsequently dropped upon Carla's request.[9] The Commonwealth also presented evidence that Carla had previously filed two Protection from Abuse ("PFA") Petitions [10] against Appellant but later sought and obtained a

leave the bar. N.T., 10/7/98, at 300. As Ms. Ferguson explained, when Carla did not respond to Appellant, he grabbed her arm, swung her around, and slapped her across the face. *Id.*

Candy Williams recounted an incident when she was helping Carla move out of Carla's house and Appellant appeared at the house, threatened to kill Carla, and pushed her up against a window, cutting her arm. *Id.* at 320–21. Ms. Williams stated that Appellant then told her to stay out of the fight or he would kill her too. *Id.* Ruby Murray testified that she saw Appellant hit Carla at the Madden Hotel bar and also heard Appellant threaten to kill Carla after they had been in a physical fight. *Id.* at 429–31.

9. Trooper Douglas Strickland testified that in November 1990, Carla reported an incident of abuse involving Appellant. N.T., 10/6/98, at 247–48. Trooper Strickland explained that he filed charges of terroristic threats and simple assault against Appellant, but in January 1991, the charges were dropped upon Carla's request. *Id.* at 248. Sergeant John Phillippy testified that in February 1992, he was summoned to Carla and Appellant's home regarding complaints of a domestic disturbance. *Id.* at 251. Sergeant Phillippy explained that based on the information he gathered at the home, he arrested Appellant for terroristic threats and simple assault. *Id.* However, according to Sergeant Phillippy, the charges were ultimately dropped upon Carla's request. *Id.*

John R. Kriner, a former trooper, testified that in May 1992, he received notice of a domestic quarrel at a local store. *Id.* at 255. Mr. Kriner testified that he went to the local store, and based on a complaint made by Carla, he charged Appellant with harassment. *Id.* Mr. Kriner stated that Carla subsequently approached him and requested that he withdraw the harassment charge, however, he refused to do so. *Id.* at 256. Therefore, according to Mr. Kriner, a hearing was held on the charges before a District Justice, and at Carla's request, the District Justice dropped the charges. *Id.* Finally, Sergeant Gary Baker testified that in April 1993, Carla came to the State Police Barracks ("Barracks") and was followed by Appellant. *Id.* at 259. According to Sergeant Baker, he filed a harassment charge against Appellant based on a complaint made by Carla. *Id.* at 259. However, like the previous charges, this charge was later dropped at Carla's request. Tr. Ct. Op., 9/28/98, at 12.

10. Pursuant to the Protection from Abuse Act, a court may enter a protective order to stop a defendant from abusing a plaintiff and any

dismissal of the Petitions.[11] The evidence further showed, however, that in October 1996, Carla filed a third PFA Petition against Appellant and, unlike the previous PFA Petitions she had filed, Carla did not seek a dismissal of this last Petition. Rather, on October 30, 1996, a final PFA order ("PFA order") was entered, with Appellant's consent, stating that Appellant could not have any contact with Carla or her children. This order was in effect when Carla and Deidra were murdered.

The evidence presented at trial also established that Appellant had been charged with the felony offense of aggravated indecent assault, 18 Pa.C.S. § 3125, and the misdemeanor offense of indecent assault, *id.* § 3126, based on allegations by Deidra that Appellant had sexually assaulted her. In August 1994, Carla brought Deidra to the Barracks in Chambersburg and the two met with Trooper Kenneth M. Stapchuck. N.T., 10/6/98, at 172. According to Trooper Stapchuck, Deidra told him that Appellant had sexually assaulted her. *Id.* at 173. Trooper Stapchuck informed Deidra that he would have to interview Appellant, and Deidra indicated that she wanted Carla to be present during the interview. *Id.* at 173–74. For more than a year, Trooper Stapchuck unsuccessfully attempted to schedule an interview with Carla and Appellant. *Id.* at

minor children associated with the parties. 23 Pa.C.S. § 6108. In such an order, the court may prohibit that defendant from having any contact with the plaintiff and the children, grant the plaintiff exclusive possession of a home owned by the plaintiff with the defendant, and grant a plaintiff custody of the parties' children. *Id.* Within ten days after the plaintiff files a PFA Petition, the court must give the defendant notice of the PFA Petition and hold a hearing, at which the plaintiff must prove the allegations of abuse by a preponderance of the evidence for a final PFA order to be entered. *Id.* § 6107.

11. Lori VanScyoc, a legal advocate at Woman in Need, an agency that provides services to victims of domestic violence, sexual assault, or personal injury crimes, testified that Carla came to the agency several times seeking assistance in filing PFA Petitions against Appellant. N.T., 10/6/98, at 270–71. Ms. VanScyoc noted that on December 13, 1991, Carla filed a PFA Petition against Appellant but that the Petition was later discontinued upon Carla's request. *Id.* at 273–74. Furthermore, there was evidence presented that on May 26, 1992, Carla filed another PFA Petition against Appellant on behalf of herself and her children, but on June 3, Carla sought a discontinuance of the Petition, which was granted. *Id.* at 274–75.

173–74. Finally, in December 1995, Carla advised Trooper Stapchuck that she did not want him to continue with the investigation because she believed that Deidra had fabricated the allegations. *Id.* at 174–75.

On July 31, 1996, Carla and Deidra returned to the Barracks. *Id.* at 179, 184–85. While at the Barracks, Carla told Trooper Mark Grove that she wanted to file charges against Appellant again based on Deidra's allegations in 1994. *Id.* According to Trooper Grove, Carla essentially told him that she had discontinued the charges in December 1995 because Appellant had stopped abusing Deidra after she spoke with Trooper Stapchuck. *Id.* Trooper Grove testified that Carla stated that she wanted to renew the charges initially made against Appellant in 1994 because Appellant had recently assaulted Deidra. *Id.* Therefore, based on the allegations initially made by Deidra in 1994, Trooper Grove filed charges of aggravated indecent assault and indecent assault against Appellant. *Id.* at 186, 225. Trooper Grove obtained a warrant for Appellant's arrest and arrested Appellant, and that same evening, Appellant was arraigned on the charges. *Id.* at 226. Two days later, Appellant was released on $10,000.00 bail subject to the conditions that he would not contact Carla or Deidra and that he would participate in a Franklin County pre-release program.

On August 12, 1996, District Justice John Wayman held a preliminary hearing regarding the charges against Appellant at which Appellant, Carla, and Deidra were present. Based on Deidra's testimony, District Justice Wayman determined that there was sufficient evidence to proceed to trial, which was scheduled for November 1996. Shortly before the scheduled trial, however, Appellant moved to continue the trial until January so that he could obtain money to hire an attorney. The trial court granted Appellant's request for a continuance and rescheduled the trial on the indecent assault charges for January 6, 1997.[12]

12. On August 19, 1996, Trooper Grove filed charges of indecent assault against Appellant based on Deidra's allegations that Appellant had sexually assaulted her again in 1996. N.T., 10/6/98, at 190, 228. A

The evidence presented at trial further showed that following the preliminary hearing on the assault charges, Appellant not only made statements evincing his intent to kill Carla and Deidra, but also sought to purchase and eventually did purchase a gun. Tyrone Kelly, who often worked with Appellant, testified that Appellant had told him about the indecent assault charges pending against him and stated that before he would let Carla obtain all of their marital property, he would wipe Carla and Deidra out. N.T., 10/6/98, at 209. Mr. Kelly also testified that several times between October and November 1996, Appellant asked him if he would buy a gun to sell to Appellant, and he refused to do so. *Id.* Vonnie Trunbaugh, a friend of Appellant's, testified that Appellant visited her in the middle of November 1996 and informed her of the indecent assault charges against him. *Id.* at 197–98. Ms. Turnbaugh said that Appellant explained that he was innocent of the charges and that "he would kill someone before he went back to jail." *Id.*

Anthony Hurd testified that in November 1996, Appellant approached him on the street in Carlisle, Pennsylvania, and inquired about obtaining a gun from him. N.T., 10/8/98, at 499–500. Mr. Hurd said that he told Appellant he would look into getting a gun for Appellant but he never actually got a gun for Appellant. *Id.* at 500–03. According to Mary Jones, however, in December 1996, Appellant asked her if she could get him a gun and she did in fact sell him a gun and six bullets. N.T., 10/7/98, at 350–54.[13] Ms. Jones stated that she did not know specifically what type of gun she sold to Appellant but after observing several different types of guns presented to her by the police, she thought that the gun she sold

preliminary hearing based on the charges was initially scheduled to be held in September 1996 but was subsequently rescheduled for January 1997 so that Appellant could obtain private counsel. *Id.* These charges were later dropped due to Deidra's murder. *Id.*

13. Brenda Short, Mary Jones' cousin, confirmed that in December 1996, Appellant came to her house to buy a gun from Ms. Jones. *Id.* at 396–99. Additionally, Cassandra B. Utley, Ms. Jones' friend, testified that she heard Appellant speak to Ms. Jones about buying a gun. *Id.* at 410.

Appellant resembled a Davis Industries .380 caliber handgun. N.T., 10/8/98, at 508–10.

The evidence presented at trial also established that although Appellant was not to contact Carla pursuant to the conditions of his bail and the PFA order obtained by Carla, he nevertheless continued to do so. According to Carla's friend Candy Williams, late one night in the middle of December 1996, Carla telephoned her crying. N.T., 10/7/98, at 323. Ms. Williams testified that Carla stated that Appellant had followed her from work to the local grocery store, assaulted her as she attempted to enter the store, and threatened to kill her. *Id.* at 325–37. Carla further told Ms. Williams that Appellant followed her home from the store and was parked in the driveway in front of her house. *Id.* at 323–24, 328. Brett Wagner testified that on December 21, 1996, he went to Carla's home to deliver toys to her children and as he was entering the driveway, he saw a man sitting in a purple pick-up truck in front of the home. *Id.* at 333–35.[11] Mr. Wagner stated that when Carla opened the door to accept the toys from him, the man from the truck approached the house and stated, "Carla, we need to talk." *Id.* at 337–38.

Donnie Williams testified that one evening in late December 1996, he was working at the Washington House Bar as a bouncer and observed Appellant attempt to speak to Carla several times. *Id.* at 294. Similarly, Karen Peoples testified that on the evening of either December 22 or 23, 1996, she was sitting at a table with Carla at the Washington House bar and during that time she saw Appellant repeatedly approach Carla and talk to her. *Id.* at 308–09. Ms. Peoples stated that Carla became very upset after Appellant left and told her that Appellant had threatened to put her lights out if he saw her talking to another man. *Id.* at 309–11.

On December 26, 1996, Carla worked from 2:50 p.m. until 11:20 p.m. at her job at South Mountain Restoration Center in Hamilton Township, Pennsylvania. After getting off work, Carla stopped at Kel's Place, a local bar in Chambersburg.

14. The evidence established that Appellant drove a purplish blue pick-up truck. N.T., 10/8/98, at 511, 542.

Ruby Murray, Carla's friend, testified that when Carla walked into the bar, she appeared distraught. N.T., 10/7/98, at 439–40. According to Ms. Murray, Carla said that Appellant had followed her to the bar and had told her that he was going to shoot her in the head and that she would not live to see another night. *Id.* Ms. Murray testified that she advised Carla to leave the bar with her and her friends and call the police, but Carla insisted on picking up her children from the babysitter's house. *Id.* at 440–42. When Ms. Murray left the bar, she observed Appellant's truck parked outside the bar. *Id.* at 443–45. Marlena Linda George Campbell, another friend of Carla's, also testified that she saw Appellant sitting in his truck before she entered Kel's Place at approximately 11:45 p.m. on December 26 and again when she left the bar shortly thereafter. *Id.* at 463–67, 471–72.[15]

Carla subsequently left Kel's Place and picked up her six children [16] at the babysitter's house in Chambersburg at approximately 12:30 a.m. on December 27. *Id.* at 477–78. After assembling her children in her minivan, Carla drove to her home in Hamilton Township. N.T., 10/6/98, at 157–58. Carla's oldest son, Jonathon, testified that on the ride home his mother appeared nervous and asked him to look out the back window of the minivan to see if Appellant was following them. *Id.* at 159. When they arrived home, Carla and her children prepared for bed and went to sleep. *Id.*[17]

**15.** Carlton Daley, Appellant's friend, testified that he also observed Appellant's truck in a lot outside of Kel's Place close to midnight on December 26, 1996. *Id.* at 459–61.

**16.** Carla was the mother of Deidra; Jonathon Moore, who was fifteen years old at the time of the murders; Joseph Moore, who was ten years old; Jeremy Moore, who was eight years old; Lorrance Reid, who was five years old; and Larissa Reid, who was four years old. N.T., 10/6/98 at 61. Lorrance and Larissa were Carla and Appellant's children and Deidra, Jonathon, Joseph, and Jeremy were Carla's children from a previous relationship. *Id.*

**17.** Carrie Marie Kuhn, Carla's friend, testified that Carla telephoned her when Carla got home to tell her that she arrived home safely. N.T., 10/7/98, at 484. However, Ms. Kuhn explained that shortly after Carla called, she had to hang up and she tried to call Carla at approximately 2:00 a.m. but there was no answer. *Id.* at 485.

Sometime during the early morning hours of December 27, Carla and Deidra each suffered a single fatal gunshot wound to the head while in their beds.[18] Carla was sleeping in a bed with her two sons, Jeremy and Lorrance. Jeremy and Lorrance did not wake when Carla and Deidra were shot, but sometime afterwards Lorrance woke up Jeremy and said he wanted to talk to Deidra. N.T., 10/5/98, at 130, 137. Jeremy and Lorrance walked to Deidra's room and when Jeremy attempted to wake Deidra, he got blood on his hands. *Id.* at 130–31, 137. Jeremy and Lorrance returned to their mother's room and discovered that their mother was also bleeding. *Id.* 131–32.

Jeremy and Lorrance went downstairs to wake up their older brother, Jonathon. *Id.* at 132. Jeremy woke up Jonathon and told him that his mother and sister were dead, but Jonathon thought that his brother was merely having a nightmare and told him to go back to bed. *Id.* at 132, 137; N.T, 10/6/98, at 162.[19] Jeremy and Lorrance subsequently fell asleep downstairs. *Id.* at 133–34. At approximately 8:30 a.m. on December 27, Jonathon woke up and discovered that both Deidra and Carla were bleeding, cold, and immobile. N.T., 10/6/98, at 163–64. Jonathon attempted to call 911 but the telephone was dead. *Id.* at 165. Consequently, Jonathon woke up his brothers, Joseph and Jeremy, and told them to go to their neighbors' homes to call the police, which they did.

The police arrived at the crime scene at 8:48 a.m. and initiated an investigation. The police found a bullet of .380 auto caliber near Carla's body and a bullet of the same caliber

18. Isidore Mihalakis, a forensic pathologist who conducted autopsies on both Carla's and Deidra's bodies, testified that both victims died as a result of a single gunshot wound to the head, and that death occurred somewhere between 1:00 a.m. and 7:00 a.m. *Id.* at 97–99, 100–03. Neither the children nor the neighbors claimed to have heard the shots that killed Carla and Deidra. *Id.* at 88, 92.

19. Jeremy testified that when he went downstairs, he noticed the motion light over the driveway, which automatically turned on for several minutes when it detected movement in front of it, turn off. N.T., 10/5/98, at 133. Jeremy looked out the window but did not see anyone. *Id.*

was subsequently recovered from Deidra's body.[20] They further learned that both a back door to the house leading into the basement and a sliding glass door that led to a porch in the back of the house were unlocked. N.T., 10/5/98, at 56–57, 81, 90–91.[21] In walking around the outside of the house, the police discovered that the telephone wire and the cable television wire leading into Carla's house had been cut. N.T., 10/5/98, at 65–66, 85–86, 112. On the left side of the house near where the cable wire had been cut, the police observed a footprint in some bark mulch. *Id.* at 112.[22] The police additionally noticed that a dotted impression had been left on the PVC utility pipe outside of the house. *Id.* at 57.

While the police were investigating the crime scene, Appellant appeared and agreed to go to the Barracks and speak with Troopers H. Wayne Sheppard and Anthony Manetta. N.T., 10/8/98, at 513. At the Barracks, Appellant told the troopers that he was in his room at the Rose Lawn Motel from 8:30 p.m. the previous evening until 9:00 a.m. that morning. *Id.* at 514–15. He further stated that he had not been near Carla's home the previous evening and that he had never owned or even shot a gun. *Id.* at 522. During the interview, Trooper Sheppard thought he saw blood on Appellant's jacket and therefore, asked him if he would consent to an analysis of the jacket. *Id.* at 516. Appellant agreed to allow the troopers to take his jacket as well as his boots and hat. *Id.*

Although an analysis of the jacket revealed that there was no blood on it, Alfred J. Schwoeble, a manager at a materials analysis laboratory specializing in electro-microscopy, exam-

20. Corporal Ernst D. Baltimore, a forensic firearm and tool mark examiner for the State Police, examined the two bullets and determined that they were both .380 auto caliber bullets and they were dislodged from the same gun. N.T., 10/8/98, at 547–56.

21. At trial, the parties stipulated to the fact that after Appellant was ordered out of Carla's home, she had the locks changed on the front door and back door leading to the basement but not on the sliding glass door. N.T., 10/9/98, at 712–13.

22. The police took close-up pictures of the impression of the shoe track left on the mulch and then placed dental stone, *i.e.*, plaster of paris, on the impression, which created a replica of the footprint on the dental stone when it dried. *Id.* at 113.

ined the jacket and discovered numerous lead rich particles on the jacket's sleeves. *Id.* at 594–95, 603. Mr. Schwoeble testified that based upon his findings, a reasonable conclusion could be drawn that the jacket had been exposed to a discharged firearm or in close proximity to a discharged firearm. *Id.* at 606–10. Sergeant Dennis E. Loose, a supervisor of the latent print and automated fingerprint identification sections of the Police Laboratory Division, testified that he compared Appellant's boots with the replica made of the shoe track impression left in the mulch outside Carla's home. *Id.* at 578–79, 581–83. According to Sergeant Loose, he could not match the tracking on the bottom of the shoes with the tracking on the shoe track impression, but he concluded that the overall length and width of Appellant's boots coincided with the shoe track impression. *Id.*

The police also requested Appellant's consent to search his room at the Rose Lawn Motel and his truck. N.T., 10/6/98, at 211–12. Appellant agreed to the searches and accompanied several troopers to his room at the motel. *Id.* In searching Appellant's room, Trooper Sheppard found a folded piece of paper wrapped in cellophane and covered with blue tape in a left shoe. Along with other notations, the names of Carla, Deidra, District Justice John Wayman, Trooper Mark Grove, Lisa Gardner, and the District Attorney of Franklin County had been written on the paper. At trial, the Commonwealth presented testimony from Rafael Martinez, a consultant to the Miami Dade County, Florida, Police Department for crimes involving Afro Caribbean religions, who had examined the paper discovered in the shoe. Commw. Ex. 24 (video deposition of Rafeal Martinez). According to Mr. Martinez, the notations on the paper were associated with the Voodoo religion practiced primarily in Haiti and they invoked assistance from a number of Voodoo deities or gods related to death or darkness. *Id.* Mr. Martinez testified that based on his training and experience, he believed to a reasonable degree of professional certainty that the person who owned the paper considered the persons named on the paper as enemies

and wanted them destroyed or dead. *Id.*[23]

Following the searches of Appellant's motel room and truck,[24] Trooper Sheppard took Appellant into custody for contacting Carla in violation of the PFA order against him as well as his bail conditions. N.T., 10/8/98, at 523.[25] Appellant was charged with the murders of Carla and Deidra in February 1997.

■ We find that the overwhelming evidence presented at trial and all reasonable inferences that may be derived from that evidence, when viewed in the light most favorable to the Commonwealth, were clearly sufficient for the jury to conclude beyond a reasonable doubt that Appellant intentionally killed both Carla and Deidra. As detailed above, the evidence includes testimony that Appellant told others that he would kill Carla and Deidra before he would go to jail for the indecent assault charges pending against him, Appellant attempted to purchase and did purchase a gun similar to the type of gun used to kill Carla and Deidra, Appellant followed Carla on the evening of the murders, and Appellant's jacket contained numerous lead particles consistent with being near a fired gun. Thus, we conclude that the evidence presented was

23. In defense, Appellant presented testimony from Monica H. Gordon, a professor of Caribbean studies at the Fashion Institute of Technology and Walden University. N.T., 10/9/98, at 686–87. Ms. Gordon agreed with Mr. Martinez that the paper had Voodoo symbols. *Id.* at 690, 699. However, Ms. Gordon testified that both under the Voodoo religion, and Obeah religion practiced in Jamaica, a client seeks help from a Voodoo or Obeah practitioner who may invoke death on others by using magical powers and the client does not himself cause death to others. *Id.* at 700.

24. The only evidence found by the police in Appellant's truck that was admitted at trial was a pair of brown and white gloves. Sergeant Loose examined a pattern of rubber bumps on the palm of the gloves with a photograph of the dotted impression left on the PVC pipe. N.T., 10/5/98, at 119–22; N.T., 10/8/98, at 579–80. Sergeant Loose could not positively identify the gloves as the source of the impression, but he did find similarities in the size of the bumps on the gloves and the space between each bump with the dotted impression on the PVC pipe. N.T., 10/8/98, at 579–80.

25. Trooper Sheppard testified that during his interview with Appellant, Appellant indicated that he had contacted Carla prior to the murders. *Id.*

sufficient to sustain Appellant's convictions for the first-degree murder of both Carla and Deidra.

In the first claim raised in his brief filed with this Court, Appellant essentially argues that the trial court erred in refusing to suppress the evidence found by the police during their search of his clothes, motel room, and truck. According to Appellant, his consent to search could not have been valid because it followed an illegal detention and was made involuntarily. This claim fails.

When reviewing a trial court's ruling denying a suppression motion, we must initially determine whether the record supports the court's findings of fact. *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1188 (1996). Where the record supports the trial court's factual findings, we are bound by those findings and may only reverse the trial court's ruling if the legal conclusions were erroneous. *Id.* The Fourth Amendment to the United States Constitution protects the right of people in this country to be secure against "unreasonable searches and seizures." U.S. Const. amend. IV. Thus, pursuant to the protections of the Fourth Amendment, before a police officer may conduct a search, he must generally obtain a warrant that is supported by probable cause and authorizes the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A search warrant is not required, however, where a person with the proper authority [26] unequivocally and specifically consents to the search. *Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888 (2000).

**26.** A person has authority to consent to a search if the person has a possessory or privacy interest in the area to be searched or the person has either explicitly or implicitly been granted permission to give consent by a person with a possessory or privacy interest in the area to be searched. *See, e.g., United States v. Matlock*, 415 U.S. 164, 171–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Stoner v. California*, 376 U.S. 483, 488–90, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). In the instant case, Appellant had the authority to consent to a search of his own clothing, motel room, and truck because he had a clear possessory interest in those objects.

■■■■■ To establish a valid consensual search, the prosecution must first prove that the consent was given during a legal police interaction, or if the consent was given during an illegal seizure, that it was not a result of the illegal seizure; and second, that the consent was given voluntarily. *Strickler*, 757 A.2d at 888–901; *see also Florida v. Royer*, 460 U.S. 491, 497, 501–07, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Dunaway v. New York*, 442 U.S. 200, 219, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). With regard to the prosecution's first burden of proof, we note that:

> Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ellis*, 541 Pa. 285, 662 A.2d 1043, 1047 (1995) (citations omitted). Thus, pursuant to the Fourth Amendment, a person may not be lawfully seized, either by means of an investigative detention or a custodial detention, unless the police possess the requisite level of suspicion.

■■■■■ "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Royer*, 460 U.S. at 497, 103 S.Ct. 1319; *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (if a reasonable person feels free to go about his or her business, the encounter is consensual and no reasonable suspicion required). Indeed, the protections provided by the Fourth Amendment for a seizure, *i.e.*, an investigative or

custodial detention, are not implicated unless a person's movement has been constrained by physical force or a show of authority. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Strickler*, 757 A.2d at 889–90; *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619, 622–23 (1994). In distinguishing a mere encounter from a seizure, a court must decide whether based on all the circumstances surrounding the interaction between the police and the individual in question, a reasonable person would have believed that he was free to decline the police's requests and terminate the interaction with the police. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[27]

▮▮▮▮▮▮ Where a court finds that a person was illegally seized before he allegedly consented to a search, any evidence obtained as a result of the search must be excluded from the evidence against the accused as fruit of the poisonous tree, i.e., the unlawful seizure, unless the prosecution can establish that the alleged consent was not a result of the illegal seizure. *Strickler*, 563 Pa. 47, 757 A.2d 884, 889–900; *see also Dunaway*, 442 U.S. at 219, 99 S.Ct. 2248. If the court finds that an illegal seizure preceded an alleged consent but the consent was not caused by the illegal seizure or that a lawful interaction preceded an alleged consent, the court must then determine whether the prosecution has adequately proven that the consent was made voluntarily and was not the product of duress or coercion. *Strickler*, 757 A.2d at 889, 901; *see also Mendenhall*, 446 U.S. at 558, 100 S.Ct. 1870; *Royer*, 460 U.S. at 497, 103 S.Ct. 1319. As in deciding whether an interaction

---

**27.** The following factors are relevant in such an assessment:

the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example—the number of officers, whether they were uniformed, whether police isolated the subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen—subject was free to decline the request for consent to search.

*Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903, 907 (2000).

is an encounter or seizure, a court must review the totality of circumstances surrounding a consent to determine whether it was made voluntarily. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. A reviewing court should evaluate the characteristics of the accused,[28] the interaction between the accused and the police, and assess how a reasonable person in the accused's shoes would have reacted to that interaction. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041; *Strickler*, 757 A.2d at 901.

Here, we find that the record supports the factual findings made by the trial court in ruling on Appellant's suppression motion. As noted by the trial court, in the early morning of December 27, after the police learned of the deaths of Carla and Deidra, Trooper William Volchako stopped Appellant and his friend as they were riding in Appellant's truck.[29] Troopers Volchako and Michael Gayman, who later appeared at the scene, asked Appellant and his friend to step out of the truck, handcuffed them, and placed each man in the back of one of their separate patrol cars. Appellant and his friend remained in the patrol cars for approximately ten minutes until Trooper Sheppard arrived at the scene of the stop.[30]

When Trooper Sheppard arrived, he removed Appellant and his friend from the patrol cars, released the handcuffs, and notified Appellant of the deaths of his estranged wife and stepdaughter. Trooper Sheppard then asked Appellant if he would meet him at the Barracks to assist in the investigation of the murders. Appellant agreed to help and arranged to meet Trooper Sheppard at the Barracks at 2:00 p.m. Appellant then left the scene of the stop. Shortly thereafter, however, Appellant drove to Carla's home where several troopers were

28. The characteristics that a court should consider include the accused's age, education, and prior criminal history. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041; *Strickler*, 757 A.2d at 901.

29. That morning, Trooper Volchako received information regarding a homicide investigation and was provided with a description of Appellant and his truck. N.T., 12/4/97, at 5.

30. Trooper Sheppard, the officer leading the double murder investigation, immediately proceeded from the crime scene to the scene of the stop upon learning that Trooper Volchako had stopped Appellant. N.T., 10/5/98, at 62.

investigating the murders. Appellant exited his truck and sat on the lawn in front of the home.

Troopers Sheppard and Anthony Manetta approached Appellant and asked him whether he wanted to go to the Barracks to speak with them at that time. N.T., 12/4/97, at 20–21, 43–44. Appellant agreed and accompanied the troopers to the Barracks in a patrol car. *Id.* En route, Trooper Sheppard advised Appellant that he was under no obligation to go to the Barracks and speak with them, but Appellant indicated that he wished to go. *Id.* at 20–21, 44. Upon arriving at the Barracks, Trooper Sheppard again informed Appellant that he was not in custody, that he did not have to speak with them, and that he would be taken back to his truck if he wanted. *Id.* at 21–22, 45. Appellant, however, agreed to speak with the troopers and spoke to them about his relationship with Carla Reid and her children. *Id.* At some point, Appellant went outside to smoke a cigarette. *Id.* at 22–23, 45–46. Appellant remained outside for approximately fifteen minutes without any of the Troopers present. *Id.*[31]

When Appellant returned inside, Trooper Sheppard asked him if he would consent to a search of his jacket, boots, hat, motel room, and truck. *Id.* Trooper Sheppard read out loud and gave Appellant a consent to search form, which explained Appellant's right to refuse to give his consent and stated that he had not been threatened or coerced in any way. *Id.;* Suppression Hrg., 12/4/97, Commw. Ex. 1. Appellant agreed to allow the troopers to search his clothing, motel room, and truck, and he signed the consent form. N.T., 12/4/97, at 23, 46.[32] Appellant then gave the troopers the clothing they

**31.** Although Appellant testified that Trooper Manetta was waiting for him inside the open door to the Barracks, the trial court found that Trooper Manetta's testimony that he returned to his desk after letting Appellant outside was more credible than Appellant's testimony. Tr. Ct. Op., 3/12/98, at 6.

**32.** At the suppression hearing, Appellant testified that the Troopers did not provide him with the consent form until after the searches were conducted. However, as found by the trial court, the record indicates that Appellant signed the consent form at the same time his clothes were seized and before items from his motel room and truck were seized.

30

requested and accompanied them to his motel room and truck. N.T., 12/4/97, at 23–26.

■ Appellant appears to initially argue that the evidence obtained from the searches he consented to must be suppressed on account of the fact that he was illegally seized on the morning of December 27, when he was stopped and physically restrained by Trooper Volchako. However, Appellant's claim fails because as even Appellant himself concedes, his consent given to Trooper Sheppard during the afternoon of December 27 was not causally linked to Appellant's detention that morning by Trooper Volchako. See App't Br., at 14. Shortly after Trooper Volchako stopped Appellant, Trooper Sheppard released him, told him about the deaths of his estranged wife and stepdaughter, arranged to meet him at the Barracks at 2:00 p.m., and allowed him to freely leave the scene. Nonetheless, Appellant proceeded to the crime scene, where the presence of the police was apparent, and exited his truck. As Appellant admits in his brief, his actions at this point were "purely voluntary." Id. Thus, because Appellant drove to the crime scene upon his own free will, we find that his consent was sufficiently attenuated and untainted by the morning detention. See Strickler, 757 A.2d at 889 (consent valid even if preceded by illegal seizure so long as consent was not result of seizure).

■ Appellant also argues, however, that while the stop by Trooper Volchako may have been attenuated from his consent, he was illegally detained when he went to the Barracks with Troopers Sheppard and Manetta and consented to the searches of his clothes, motel room, and truck. We disagree. There is no indication in the record that the troopers used any physical force or otherwise coerced Appellant at the crime scene or at the Barracks. Upon seeing Appellant at the crime scene, the troopers simply approached him and asked him whether he wanted to go to the Barracks with them rather than meet them there later that afternoon, as previously scheduled. On the way to the Barracks and again once they arrived at the Barracks, Trooper Sheppard informed

Appellant that he did not have to speak with them and that he would be taken back to his truck whenever he wanted. Appellant did not make any indication that he wished to leave and proceeded to speak with the troopers. Furthermore, Appellant left the Barracks for a fifteen-minute cigarette break without any constraints. Given all of these circumstances, we cannot find that a reasonable person in Appellant's position would have believed that he was not free to leave. *Compare Bostick*, 501 U.S. at 437–38, 111 S.Ct. 2382 (defendant not seized where police approached him on bus and asked to search his bags as the police did not exhibit any physical force or signs of authority and told defendant that he could refuse to consent), *with Royer*, 103 S.Ct. at 1326 (defendant was seized when police officers asked him to accompany them to a police room, while retaining his airline ticket and driver's license, and did not tell defendant that he was free to depart). Accordingly, contrary to Appellant's claim, he was not seized when he went to the Barracks with the troopers and spoke with them. Rather, the interaction between Appellant and the troopers was merely a consensual encounter, which did not need to be supported by reasonable suspicion.[33]

█ Although the interaction between the troopers and Appellant at the Barracks was a lawful consensual encounter, we must still determine whether Appellant's consent was made voluntarily under the totality of the circumstances surrounding the consent. *See Strickler*, 757 A.2d at 901. Here, the troopers asked for Appellant's consent to search his clothes, truck, and motel room after he returned from his cigarette break. Trooper Sheppard read to Appellant a consent form explaining his right to refuse his consent and Appellant signed the form. At the time he gave his consent,

33. Even if we were to conclude that Appellant was subject to an investigative detention at the Barracks, we find that in conducting the homicide investigation, the troopers had reasonable suspicion to detain Appellant based on the fact that Carla Reid had sought a PFA order against him and the fact that Deidra Moore had accused him of sexually abusing her and a criminal trial was scheduled to begin against Appellant on those charges ten days after the date of the murders. *See Terry v. State of Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

32

Appellant was a forty-eight-year-old man and he had been involved with the criminal judicial system for several months regarding the indecent assault charges brought against him in October 1996. He had applied for and was granted court-appointed counsel in that case. While Troopers Sheppard and Manetta testified that Appellant appeared distraught when he appeared at the crime scene, they also testified that he was cooperative and conversational with them. N.T., 12/4/97, at 20–21, 27, 29, 45. As noted in the discussion above, there is no evidence in the record that the troopers coerced Appellant into providing his consent and in fact, Trooper Sheppard specifically notified Appellant that he had the right to withhold his consent. *See Mendenhall*, 446 U.S. at 559, 100 S.Ct. 1870. Further, we do not find anything in the record that indicates that Appellant misunderstood his rights as read to him by Trooper Sheppard. Thus, upon our review of the circumstances under which Appellant provided his consent and Appellant's individual characteristics, we conclude that Appellant's consent was made voluntarily.

■ Appellant also argues that even if we find that his consent to search his truck on December 27, 1996 was valid, his consent ended once he was taken into custody for violating the outstanding PFA order against him. Therefore, according to Appellant, the search of his truck on December 30, 1996, by Trooper Kevin Scott was outside the scope of his consent, and the evidence obtained by Trooper Scott from his truck was erroneously admitted.[34] This claim fails.

■ When an official search is properly authorized, the scope of the search is limited by the terms of its authorization. *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange

34. Appellant failed to raise this claim below and therefore, it should be deemed waived. *See* Pa.R.A.P. 302(a). Nonetheless, because this is a direct appeal of a death penalty case, we shall review the instant claim. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 955 n. 19 (1982).

between the officer and the person who gave the consent. *Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801.

Here, after Appellant voluntarily consented to allow a search of his truck, he accompanied Troopers Sheppard, Manetta, and Jeffrey Bopp to the truck where they conducted a roadside search.[35] Following the search, the troopers and Appellant returned to the Barracks and Appellant was placed in custody for violating the PFA order entered against him. Appellant's truck was subsequently towed to a storage facility. Appellant did not make any indication to the troopers either during or after the search that he wanted them to stop searching the truck. N.T., 12/4/97, at 27, 56. Thus, on Monday, December 30, Trooper Scott, a member of the State Police Identification Unit, further searched Appellant's truck and obtained a pair of brown and white gloves, which had not been seized during the previous search. N.T., 10/5/98, at 119.[36] Given that Appellant did not at any point revoke his consent to allow the police to search his truck and that Trooper Scott searched the truck within a relatively short time span after Appellant provided his consent, we conclude that Trooper Scott's search was within the scope of Appellant's consent.[37] Accordingly, as we find that Appellant and

35. In searching the truck, the troopers seized some knives, a machete, a file, and some brown leather gloves. Suppression Hrg., 12/4/97, Commw. Ex. 4. However, none of these items were admitted at Appellant's trial.

36. The Commonwealth asserts that Trooper Scott was not able to search the truck on Friday, December 27 because he attended the autopsies of the victims until late that evening. Thus, according to the Commonwealth, Trooper Scott searched the truck the following business day.

37. Even assuming arguendo that Trooper Scott's search was outside the scope of Appellant's consent, the trial court's failure to suppress the evidence obtained by Trooper Scott would amount to no more than harmless error. "An error is considered harmless when, in light of the overwhelming evidence of guilt, the error was so insignificant that it could not have contributed to the verdict." *Rivera,* 773 A.2d at 138. Here, there was testimony presented at trial that a pattern on the palm of the gloves found by Trooper Scott was similar to an impression left on the PVC pipe outside Carla Reid's home. *See supra,* n. 24. However, the pattern on the gloves could not be definitely matched to the impression on the PVC pipe, *see id.,* and therefore, the gloves were of

the police were involved in a mere consensual encounter at the time Appellant gave his consent, that Appellant voluntarily consented to a search of his clothing, hotel room, and truck, and that Trooper Scott's search of Appellant's truck was within the confines of Appellant's consent, the trial court properly denied Appellant's motion to suppress the evidence obtained during those searches and Appellant's claim fails.

Appellant next argues, in a cursory manner, that the trial court erred in admitting evidence that criminal charges were previously filed against Appellant based on complaints by Carla and that those charges were later dropped upon Carla's request.[38] We disagree.

The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. *Jones*, 683 A.2d at 1193. In determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. *Id.* Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1061 (2001). Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact. *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186, 192, n. 11 (1977).

Evidence of prior bad acts committed by a defendant is not admissible solely to show the defendant's bad character or his propensity for committing bad acts. *Com-*

minimal evidentiary value. Accordingly, in light of the other over-whelming evidence of Appellant's guilt, even if we were to find that the gloves should have been suppressed, the error was harmless.

**38.** In his argument, Appellant solely complains of the criminal charges testified to by law enforcement officers. *See supra*, n. 9. Appellant does not in any way indicate that he is also challenging the PFA Petitions filed by Carla, *see supra*, n. 10, and therefore, any issue regarding the admissibility of the Petitions is not before this Court.

*monwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 840 (1989).
However, evidence of prior bad acts is admissible where there
is a legitimate reason for the evidence, such as to establish: 1)
motive; 2) intent; 3) absence of mistake or accident; 4) a
common scheme or plan; and 5) identity. *Id.* The evidence
may also be admissible to impeach the credibility of a testify-
ing defendant; to show that the defendant has used the prior
bad acts to threaten the victim; and in situations where the
bad acts were part of a chain or sequence of events that
formed the history of the case and were part of its natural
development. *Id.* In order for evidence of prior bad acts to be
admissible as evidence of motive, the prior bad acts "must give
sufficient ground to believe that the crime currently being
considered grew out of or was in any way caused by the prior
set of facts and circumstances." *Commonwealth v. Schwartz,*
445 Pa. 515, 285 A.2d 154, 158 (1971).

Here, the Commonwealth filed a motion in limine in
which it asked the trial court to admit evidence that criminal
charges were previously filed against Appellant based on
complaints by Carla and those charges were subsequently
dropped upon Carla's request. According to the Common-
wealth, such evidence was relevant to establish Appellant's
motive for killing Carla and Deidra because it showed that a
pattern existed in Carla's relationship with Appellant whereby
criminal charges were filed against Appellant based on his
conduct towards Carla and Carla would subsequently seek to
have the charges dropped because she was persuaded by
Appellant to do so. Thus, the Commonwealth claimed that
such evidence tended to establish that Appellant killed Carla
and Deidra because they would not force the indecent assault
charges pending against Appellant to be dropped, as Carla
had done previously with the other criminal charges filed
against Appellant. The trial court agreed with the Common-
wealth that evidence of the fact that criminal charges were
previously filed against Appellant and later dropped due to
Carla's request was relevant to support the Commonwealth's
theory of Appellant's motive. Tr. Ct. Op., 9/28/98, at 12.
However, the trial court determined that evidence of the

underlying basis for the charges was not only unnecessary to advance the Commonwealth's theory but also would be inherently prejudicial to Appellant given that the charges were never proven. *Id.* Therefore, on September 28, 1998, the trial court entered an order permitting the Commonwealth to present evidence solely of the fact that previous charges had been filed against Appellant and that Carla had subsequently requested that they be withdrawn. Tr. Ct. Order, 9/28/98.[39] Pursuant to the trial court's order, at trial, the Commonwealth presented testimony from four separate law enforcement officers who merely stated that they had filed charges based on complaints made by Carla and that the charges were later dropped following Carla's request. *See* N.T., 10/5/98, at 247–61.[40]

39. Appellant contends that in its September 28 order, the trial court ruled that the Commonwealth could not present evidence of the prior charges of abuse and the fact that they were later withdrawn. As noted above, however, the trial court found that the Commonwealth could present evidence of the fact that the prior charges were brought and that they were subsequently withdrawn. Appellant also seems to argue that the trial court reconsidered its decision regarding the admission of the charges in its order entered on October 2, 1998. On October 2, the trial court entered an order ruling that the Commonwealth could present testimony from witnesses regarding their observations of prior abuse by Appellant of Carla and the fact that Carla filed a complaint in 1994 charging Appellant with sexually abusing Deidra, which she subsequently had dropped. Tr. Ct. Order, 10/2/98. Contrary to Appellant's claim, in its October 2 order, the trial court did not reconsider its earlier decision that the Commonwealth could only present evidence of the fact that charges had been brought against Appellant and later withdrawn at Carla's request. *See id.*

40. We note that in responding to a question by the prosecutor about Carla Reid's demeanor in making a complaint in April 1993, Sergeant Baker briefly referred to, without any objection by defense counsel, the reasons for the complaint. *Id.* at 260–61. Appellant does not specifically challenge the admission of these comments. However, we note that because the comments were merely a fleeting reference and because of the overwhelming evidence against Appellant, we do not find that the admission of such comments was erroneous. *See Commonwealth v. Blystone*, 555 Pa. 565, 725 A.2d 1197, 1204–05 (1999) (mere passing references to prior criminal activity do not require reversal where defendant not prejudiced because overwhelming evidence of guilt); *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 230 (1995) (no ineffective assistance of counsel where comments were non-responsive to prosecutor's question but simply blurted out and not emphasized by prosecutor).

██ We agree with the trial court that the evidence of the fact that criminal charges were previously filed against Appellant based on complaints by Carla and that the charges were later withdrawn due to Carla's request was relevant to proving Appellant's motive for killing Carla and Deidra. Clearly, the fact that criminal charges had been filed against Appellant based on complaints by Carla and that shortly thereafter the charges were withdrawn upon Carla's request showed that Appellant had a motive to kill both Carla and Deidra because they would not cause the indecent assault charges pending against Appellant to be terminated, as Carla had done in the past. Accordingly, we find that the evidence of the fact that criminal charges had previously been brought against Appellant and later withdrawn on Carla's request was properly admitted.

Appellant additionally argues that his trial counsel were ineffective for failing to object to the Commonwealth's admission of a photograph of a gun because it was not properly authenticated. This claim also fails.

██ In order for a defendant to obtain relief based on a claim of ineffective assistance of counsel, he must show that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis designed to effectuate the defendant's interests for the act or omission in question; and (3) counsel's ineffectiveness actually prejudiced the defendant, *i.e.*, but for counsel's ineffectiveness, there is a reasonable possibility that the outcome of the proceedings would have been different. *Commonwealth v. Douglas*, 558 Pa. 412, 737 A.2d 1188, 1199 (1999). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chooses a particular course that had some reasonable basis designed to effectuate his client's interest." *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 237 (1998).

██ As in the admission of any other evidence, a trial court may in its discretion admit demonstrative evidence, such as a photograph, if its relevance outweighs any potential prejudice effect. *Commonwealth v. Hudson*, 489 Pa. 620, 414

A.2d 1381, 1386 (1980). Demonstrative evidence, however, must also be properly authenticated by evidence sufficient to show that it is a fair and accurate representation of what it is purported to depict. Pa.R.E. 901(a). Demonstrative evidence may be authenticated by testimony from a witness who has knowledge of what the evidence is proclaimed to be. Pa.R.E. 901(b)(1).

■ Here, Trooper Sheppard testified at trial that in September 1997, he spoke with Mary Jones regarding the gun that she sold to Appellant. N.T., 10/8/98, at 509. Trooper Sheppard explained that Ms. Jones did not know the specific type of gun that she sold to Appellant so he showed her several guns and asked her whether any of them resembled the gun she sold to Appellant. *Id.* According to Trooper Sheppard, she indicated that a .380 caliber handgun looked like the gun. *Id.* Consequently, during the trial, the Commonwealth introduced into evidence, without any objection by defense counsel, a photograph of the gun that Ms. Jones identified to Trooper Sheppard as a gun resembling the one she sold to Appellant. N.T., 10/7/98, at 356–57. The Commonwealth authenticated the photograph by showing it to Ms. Jones, who testified that the photograph depicted the gun she identified to Trooper Sheppard as resembling the one she sold to Appellant. *Id.* Given that Ms. Jones personally sold a gun to Appellant, she clearly had sufficient knowledge to authenticate the photograph as a picture of a gun similar to the one she sold to Appellant.

■ Appellant also seems to argue, however, that the photograph of the gun was improperly admitted because Ms. Jones could not definitively identify the gun in the photograph as the gun she sold to Appellant. We disagree. The Commonwealth never presented the photograph as a photograph of the gun sold to Appellant but merely presented it as a gun similar in appearance to the gun sold to Appellant. Such evidence was clearly relevant in tending to establish that Appellant killed Carla Reid and Deidra Moore because days before their murders, Appellant purchased a gun from Ms.

Jones that resembled a handgun of .380 caliber, a type of handgun capable of discharging the .380 auto caliber bullets found at the crime scene. Further, we do not find that such evidence should have been excluded as unduly prejudicial to Appellant because the Commonwealth made clear that the photograph was not a depiction of the actual gun but rather, a gun that merely resembled the actual gun used in the shootings.[41] N.T., 10/7/98, at 357. Accordingly, because we find that the photograph of the gun was properly admitted and authenticated as a gun resembling the gun sold to Appellant, Appellant's ineffectiveness claim fails for lack of arguable merit.

In his final claim, Appellant essentially argues that his trial counsel were ineffective for presenting mitigating evidence, specifically evidence that he suffered from a mental illness, because they never properly consulted with him regarding such evidence and he did not want them to present such evidence. We disagree.

"A criminal defendant has the right to decide whether mitigating evidence will be presented on his behalf." *Commonwealth v. Sam,* 535 Pa. 350, 635 A.2d 603, 611 (1993). Thus, where a defendant has specifically instructed his counsel not to present evidence of mitigating circumstances, defense counsel has no duty to introduce such evidence. *Id.; Com-*

41. Appellant argues that the cases of *Semet v. Andorra Nurseries, Inc.,* 421 Pa. 484, 219 A.2d 357 (1966), and *Jara v. Rexworks, Inc.,* 718 A.2d 788 (Pa.Super.1998), support his position that the photograph of the gun was inadmissible. In *Semet,* this Court determined that the trial court properly excluded photographs of a ladder purportedly involved in the accident at issue there because there was no legally admissible testimony that the ladder in the photograph was the actual ladder that collapsed causing the plaintiff to suffer injuries. 219 A.2d at 358–59. Similarly, in *Jara,* the Superior Court determined that a photograph of a switch box meant to show the condition of the switch box at the time of the accident was inadmissible because there was no evidence that the photograph portrayed the actual switch box in place at the time of the accident. 718 A.2d at 796. Given that the plaintiffs in both *Semet* and *Jara* sought to introduce the photograph as a depiction of the actual objects involved in the accident, those cases are distinguishable from the instant case where the Commonwealth solely alleged that the photograph portrayed a gun similar to the actual gun Ms. Jones sold to Appellant.

*monwealth v. Tedford,* 523 Pa. 305, 567 A.2d 610, 626–27 (1989). On the other hand, where a defendant has not directed his counsel to refrain from presenting mitigating evidence, defense counsel has a duty to undertake a reasonable investigation to determine whether mitigation evidence exists. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 735 (2000). When a reasonable investigation would have revealed that mitigation evidence on behalf of a defendant existed, defense counsel may be deemed ineffective for failing to present such evidence. *See Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1189–90 (1999); *Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221, 1234 (1996) (plurality opinion) (Appellant's sentence vacated where defense counsel failed to present any mitigating evidence of Appellant's mental problems and record reflected that Appellant suffered mental problems and such evidence may have altered outcome of penalty phase).

Here, prior to trial, Appellant's trial counsel attempted to obtain information from Appellant concerning his family, friends, prior schools, and previous jobs in order to prepare for a potential penalty phase of the trial. However, Appellant refused to provide them with the requested information. On February 2, 1998, trial counsel filed a motion with the trial court regarding Appellant's refusal to help them prepare for the penalty phase. The following day, the trial court held a hearing on trial counsels' motion. During that hearing, one of Appellant's trial counsel explained that both he and his co-counsel had contacted Appellant several times and asked for information to prepare for the penalty phase. N.T., 2/3/98, at 1–2. The trial court explained to Appellant that his counsel needed information to properly prepare for the penalty phase because the penalty phase was scheduled to start immediately after the jury's verdict should the jury return a verdict of guilty. *Id.* at 3–4. Appellant informed the trial court that he understood why his counsel wanted the information but he did not want to give them the requested information unless a guilty verdict was rendered. *Id.* The trial court determined

that Appellant had the right not to provide the requested information to his trial counsel and that he would not be ordered to do so. *Id.* at 6–7.

While Appellant clearly informed his trial counsel and the trial court that he did not want to provide information to his trial counsel to help them prepare for the penalty phase, there is no indication either in the February 3, 1998 hearing or the record that he ever specifically advised his trial counsel that he did not want them to present mitigating evidence. Appellant's counsel, Stephen D. Kulla, stated during the penalty phase,

Numerous times I have in person met with him at the prison, as did Mr. Trambley, and I believe Mr. Keller, to gain information for use in the mitigation stage, and even after the verdict on Friday [I] asked [Appellant] if there were any witnesses he wanted me specifically to bring here today to testify as to character. And he advised me that there weren't any, and I was not to worry about that, therefore, we have formulated the strategy that we're promulgating today on our own without any assistance from [Appellant] *but [it] is without any direction from him not to go forth in this matter.*

N.T., 10/12/98, at 901–02 (emphasis added). Accordingly, because the record shows that Appellant's counsel repeatedly spoke to Appellant regarding the presentation of mitigation evidence, and that Appellant, although uncooperative, never directed counsel not to present mitigation evidence of any kind until he did so in the middle of the actual penalty phase,[42] we

---

**42.** During the penalty phase, Appellant's trial counsel presented evidence to support the mitigating factor that Appellant did not have a prior criminal record, 42 Pa.C.S. § 9711(e)(1), and the catch-all mitigating factor, 42 Pa.C.S. § 9711(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). N.T., 10/12/98, at 923, 895–96. In support of the catch-all factor, trial counsel presented evidence that Appellant cared about his two children, Lorrance and Larissa, *id.* at 870–71, and behaved well in prison, *id.* at 906. Trial counsel further sought to show that Appellant suffered from a mental illness. *Id.* at 912, 917. Trial counsel therefore introduced testimony from Appellant's former girlfriend who stated that Appellant did not like others to know his

do not believe that trial counsel was ineffective for presenting mitigating evidence on Appellant's behalf. Indeed, we find that trial counsel clearly had a reasonable basis for presenting such evidence, specifically, that the jury might find a mitigating circumstance and determine that the mitigating circumstance outweighed any aggravating circumstances they also found to exist.[43]

business and requested that she ask for "double six oh nine" when she telephoned him at a friend's house. *Id.* at 871. One of Appellant's former housemates testified that a fire erupted in the kitchen one day when Appellant was home alone and Appellant first blamed the fire on her and then claimed that a stranger ran through the home and turned the stove on. *Id.* at 874. Trial counsel also presented evidence from Appellant's former co-workers who testified that Appellant was difficult to get along with and temperamental. *Id.* at 876–86.

Appellant's attorney trying the case, Stephen D. Kulla, additionally sought to call his co-counsel, Robert J. Trambley, as a witness to testify as to his interactions with Appellant. *Id.* at 907. Appellant, however, refused to waive his attorney client privilege to allow Mr. Trambley to testify and therefore, the trial court prohibited him from testifying. *Id.* at 909. Appellant's trial counsel then attempted to call Abrahm Martin Hostetter and Neil Blumberg, two psychiatrists who had examined Appellant and testified during the competency proceedings, in order to establish that Appellant suffered from a mental illness. *Id.* at 910. Nonetheless, because Appellant notified the trial court that he did not want the psychiatrists to testify, the trial court precluded them from doing so. *Id.* at 915–17. At that point in the hearing, Appellant informed trial counsel that he did not want him to present any more evidence or argue during his closing argument that he suffered from a mental illness. *Id.* at 917. Accordingly, pursuant to this Court's decision in *Commonwealth v. Sam*, 635 A.2d at 611, trial counsel refrained from presenting any more evidence or arguing that Appellant suffered from a mental illness. N.T., 10/12/98, at 927–28.

**43.** We point out that the jury did find one mitigating circumstance presented by trial counsel on behalf of Appellant, that Appellant did not have a prior criminal history. We further note that while the evidence presented by trial counsel meant to show that Appellant suffered from a mental illness may have portrayed Appellant in a bad light, trial counsel had a reasonable basis for presenting such evidence. Trial counsel intended to present the testimony from Appellant's friends and former co-workers along with the testimony of the two psychiatrists who examined Appellant to show that Appellant's actions were indicative of a mental illness for the catch-all mitigating factor. *See* N.T., 10/12/98, at 895–96, 917. However, because Appellant decided in the middle of the penalty phase that he did not want the psychiatrists to testify or trial counsel to argue during closing arguments that Appellant suffered from a mental illness, trial counsel was precluded from effectively making such a presentation. Therefore, because Appellant himself decided to

 Therefore, as we find that Appellant's claims for relief are without merit, we must affirm Appellant's sentence of death unless we determine that the sentence was the product of passion, prejudice or any other arbitrary factor, or the evidence fails to support the finding of at least one aggravating factor. 42 Pa.C.S. § 9711(h)(3). Based upon our review of the record, we conclude that the sentence of death was not the product of passion, prejudice or any other arbitrary factor. Rather, it was based upon evidence properly admitted at trial.

We additionally conclude that the evidence adduced at trial and during the penalty hearing was sufficient to support the jury's finding of at least one aggravating factor found by the jury with regard to Appellant's convictions for the first-degree murder of both Carla and Deidra. Indeed, we find that the evidence supports all of the aggravating factors found by the jury. The evidence sufficiently established that both Deidra and Carla would be testifying during the criminal trial in which Appellant was charged with the felony of aggravated indecent assault, *see* N.T., 10/6/98, at 187–88, 226, N.T., 10/12/98, at 842, and Appellant killed them in order to prevent them from testifying during that trial, *see* N.T., 10/6/98, at 197–98. *See* 42 Pa. § 9711(d)(5). Further, we conclude that the evidence showed that Appellant killed both Carla and Deidra during the course of the felony of burglary, in that he unlawfully entered Carla's home with the intent of killing Carla and Deidra. *See* 18 Pa.C.S. § 3502; 42 Pa.C.S. § 9711(d)(6). Finally, the evidence showed that Appellant was convicted of the first-degree murder of Deidra, which was committed at the time of the murder of Carla and for which a sentence of death is imposable. *See* 42 Pa.C.S. § 9711(d)(10). Likewise, the evidence established that Appellant was convicted of the first-degree murder of Carla, which was committed at the time of the murder of Deidra, for which a sentence of

stop trial counsel in the middle of his presentation, trial counsel did not act unreasonably by only presenting half of the evidence he intended to admit in order to show that Appellant suffered from a mental illness. *See, e.g., Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1377 (1984) (as counsel's lack of preparation was result of defendant's actions, counsel not ineffective).

death is imposable. *See id.* We therefore affirm Appellant's convictions and judgment of sentence.[44]

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Mr. Justice SAYLOR files a concurring opinion in which Mr. Chief Justice ZAPPALA joins.

## CONCURRING OPINION

Mr. Justice SAYLOR.

I join the majority opinion, save for its conclusion that the December 30, 1996, search of Appellant's vehicle was necessarily within the scope of the consent Appellant had provided several days earlier, *see* Majority Opinion, at 549. *See generally* 3 WAYNE R. LaFAVE: A TREATISE ON THE FOURTH AMENDMENT § 8.1, at 629 (3d ed.1996) (stating that "[e]xcept in unusual circumstances or when the consent expressly indicates otherwise, it would seem that a consent to search may be said to be given upon the understanding that the search will be conducted forthwith and that only a single search will be made"). I agree, however, that, to the extent that the search was invalid, the admission at trial of evidence obtained during the search constituted harmless error. *See* Majority Opinion, at 549 n.38.

Mr. Chief Justice ZAPPALA joins this concurring opinion.

---

44. We direct the Prothonotary of the Supreme Court to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).