J-A29018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CALVIN MCKINNEY | : | |
| | : | |
| Appellant | : | No. 78 MDA 2020 |

Appeal from the Judgment of Sentence Entered October 21, 2019,
in the Court of Common Pleas of Dauphin County,
Criminal Division at No(s): CP-22-CR-0001113-2018.

BEFORE:   DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                   **FILED MARCH 31, 2021**

Calvin McKinney appeals from the judgment of sentence imposed following his conviction of criminal attempt (homicide).[1] We affirm.

On December 29, 2017, a shooting occurred in Harrisburg, Pennsylvania, which caused the vehicle that Keynen Guider was driving to be damaged by numerous bullet holes. Although Guider was unharmed in that incident, a few days later he was shot to death. Police filed charges related to both shootings against McKinney. On January 24, 2018, police charged him at docket CP-22-CR-0001113-2018 with criminal attempt (criminal homicide), recklessly endangering another person ("REAP"), firearms not to be carried

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 901(a).

without a license, and possession of firearm prohibited. Prior to trial, the Commonwealth withdrew the charges of REAP and firearms not to be carried, and the charge of possession of firearm prohibited was severed.

Police simultaneously charged McKinney at docket CP-22-CR-0001117-2018 with criminal homicide, conspiracy (criminal homicide), firearms not to be carried without a license, and possession of a firearm prohibited. Prior to trial, the conspiracy charge was withdrawn by the Commonwealth and the firearms charges were also severed.

The two cases were consolidated and the matter proceeded to trial in August 2019. The trial court set forth the factual evidence adduced at trial as follows.

> On December 27, 2017, [McKinney] and his girlfriend, Erica Smith (hereinafter "Erica"), were at Choice Discount Outlet located at 2408 Market Street, Harrisburg, Pennsylvania. After exiting the convenience store, [McKinney] and Erica returned to his vehicle and drove away. While at the red light on Market Street, [McKinney] noticed in his rear-view mirror a male put his hands in the air as if he was trying to get their attention. Although neither [McKinney] nor Erica could see who the individual was, [McKinney] thought it could have been one of his friends, so he turned around and went back. When they returned to the parking lot, Erica realized that the individual was Keynen Guider a/k/a Man-Man (hereinafter "Mr. Guider" or "the victim").

> When [McKinney] pull[ed] next to him, Mr. Guider [was] yelling about [McKinney] looking at his car. [McKinney] stated that he did not know who he was, to which Mr. Guider responded that [McKinney] "knows who he is." Erica testified that [McKinney] remained calm, but the situation was escalating because Mr. Guider was very upset. At that point, Erica told [McKinney] to leave. After this incident, [McKinney] called someone to find out why Mr. Guider was so upset.

In her statement to Detective Richard Iachini (hereinafter "Detective Iachini") of the City of Harrisburg Police Department on January 7, 2018, Erica stated that she believed Mr. Guider was driving a black vehicle. However, she did not personally see Mr. Guider near a vehicle and was basing her answer solely on information from [McKinney]. Additionally, she told Detective Iachini that Mr. Guider was not threatening [McKinney].

At 12:22 P.M. on December 29, 2017, a 911 call was made by a female stating there was a shooting near her residence. Officer Cynthia Kreiser (hereinafter "Officer Kreiser") of the City of Harrisburg Police Department responded to the 1900 block of Market Street for the aforementioned report of shots fired. Upon arriving on the scene, Officer Kreiser testified that she was flagged down around North 20th Street and Ethel Alley by Carla Goicoechea (hereinafter "Ms. Goicoechea"). Ms. Goicoechea relayed what she saw and heard, as well as provided a description of the shooter as a skinny, light-skinned black male. Ms. Goicoechea later provided more details about the shooter that she remembered - a male in his early to middle 30's, approximately 5'7" with a beard and moustache wearing a black coat, blue jeans, and a gray beanie with a black and red ball on top.

Ms. Goicoechea testified at trial and stated that she was on the second (2nd) floor in the front room folding laundry on her bed when she heard gunshots and looked through the blinds on her window. She saw two (2) vehicles - a black Chevrolet Malibu speeding away up 20th Street and a brown Chevrolet Impala driven by the shooter. Additionally, she watched as the shooter ran up the street and stopped briefly in front of her home before getting into his vehicle. Ms. Goicoechea observed the shooter's unobstructed face for approximately fifteen (15) seconds. She was also able to provide the first three (3) digits of the out-of-state license plate on the shooter's vehicle to police.

In her statement to police, Ms. Goicoechea stated that the shooter was approximately 5'7". However, Ms. Goicoechea testified that the shooter was tall and that she was unsure of the exact height because she was looking down from the second (2nd) floor. When questioned, she testified that she believed 5'7" was tall for a man. On January 15, 2018, Ms. Goicoechea met with Detective Iachini and was shown a photo array wherein she selected the person she believed to be the shooter. During the trial, Ms. Goicoechea made an in-court identification of [McKinney]

as the person she observed to be the shooter on December 29, 2017 - the same person she selected from the photo array.

We also heard testimony from Teresa Smith (hereinafter "Teresa"), who resides at 1926 Market Street. On December 29, 2017, Teresa was bringing the recycling bins in from the street when she heard a popping noise. She walked to the street and saw a male in the middle of the street shooting up 20th Street. She did not see who he was shooting at and went inside to call 911. Once inside, Teresa looked outside, but did not get a good look at the shooter. She only stated that the shooter was a light-skinned African American male who got into a grayish-blue vehicle and turned right on Ethel Alley. In her statement to police, Teresa stated that the shooter was of average build, but since he was bending over with the gun in both hands it was hard to tell his exact size and height. Additionally, she told police that she was unsure of the color of the vehicle and believed it was blue or gray.

We also heard testimony from Ariele Morrison (hereinafter "Ms. Morrison"), Mr. Guider's cousin, and owner of the vehicle Mr. Guider was driving on December 29, 2017. Ms. Morrison testified that she received a phone call from Mr. Guider on December 29, 2017 stating that her vehicle was shot up. She stated that Mr. Guider sounded upset and informed her that the shooting occurred near 19th and Park Street - a couple blocks from 20th and Market Streets. Ms. Morrison met Mr. Guider after work in an alleyway near 18th and Park Streets and drove the vehicle back to her residence. She parked it on the sidewalk against [the] house and Mr. Guider purchased a cover to put over it. Initially, Ms. Morrison did not report the incident to police because Mr. Guider said he would take care of it and filed a fraudulent claim with her insurance company. However, when she learned that Mr. Guider had been murdered on December 31, 2017, she called police and reported the incident from December 29, 2017.

On January 4, 2018, forensic investigator William Kimmick (hereinafter "Investigator Kimmick") of the City of Harrisburg Police Department spoke with Ms. Morrison about her vehicle that was shot. Investigator Kimmick went out to her residence where he was led to the vehicle parked under a tarp. He photographed and collected evidence - there were bullet holes in the windshield, rear window, hood, rear passenger window, and front passenger window. Projectiles from the front passenger door and steering wheel, as well as eleven (11) .40 caliber cartridges collected from

the scene, were sent to the Pennsylvania State Police lab for analysis. All eleven (11) cartridges were found south of Ethel Alley. The cartridges were tested, and all were from .40 caliber Smith and Wesson bullets that were discharged from the same unknown firearm.

On December 30, 2017, Javon McKinnon a/k/a "Whoopy" (hereinafter "Mr. McKinnon") was visiting his mother at 1938 Brookwood Street when Mr. Guider called and asked if he wanted to hang out. At the time, Mr. McKinnon was driving his wife's van, which he parked in front of his mother's home. When Mr. Guider arrived, Mr. McKinnon went outside and saw a darkish blue or black vehicle pull away but was not able to see who was inside. He subsequently told police that he believed there were two (2) females inside the blue vehicle. Mr. Guider was driving a rented blue Chevrolet Impala.

The two (2) females were Aja Washington (hereinafter "Ms. Washington") and Sharayne Cook (hereinafter "Ms. Cook") who testified at trial. Ms. Cook was driving Ms. Washington's dark blue Chevrolet Malibu with tinted windows that evening. The pair were driving around trying to meet up with Ms. Cook's cousin, Brittany Jackson, and go to a couple local bars. While travelling on Brookwood Street toward Double D's Bar and Grill located at 564 South 19th Street, Ms. Cook saw Mr. Guider in his vehicle stopped in the middle of [the] street and Mr. McKinnon getting into the passenger side. At 11:47 P.M. on December 30, 2017, Ms. Cook calls [McKinney] and has a six (6) minute conversation with him. [McKinney's] cell phone records show that the call hit off Tower 0594, which is .430 miles from the location of the shooting.

At 12:56 A.M. on December 31, 2017, Ashley McKinnon (hereinafter "Mrs. McKinnon") received a call from [McKinney] asking if she was with Mr. McKinnon because someone had told [McKinney] they saw Mr. McKinnon and Mr. Guider get into her car in front of 1938 Brookwood Street. [McKinney's] cell phone records show that the call hit off Tower 0594, near the scene of the homicide. Mrs. McKinnon became angry because Mr. McKinnon was supposed to be at the hotel room with her children so she called Mr. McKinnon and asked why he would leave them there. After that phone call, Mr. McKinnon and Mr. Guider continued to drive around for approximately thirty (30) more minutes.

When they returned to 1938 Brookwood Street, Mr. McKinnon was getting out of Mr. Guider's vehicle when someone began shooting at them. Mr. McKinnon subsequently told police that he saw two (2) shadows near his wife's parked van. Mr. McKinnon jumped back into Mr. Guider's vehicle while continuing to be shot at. He heard Mr. Guider scream and tried to grab him while simultaneously avoiding gunfire. The next time Mr. McKinnon looked up; the vehicle was crashing into a pole. Mr. McKinnon jumped out of the car and ran, eventually circling back to his mother's residence. At the time, he did not realize that he was shot in the leg and through his scrotum until paramedics arrived.

At 1:28 A.M., a 911 call was made by a female stating that a male was shot. Approximately two (2) minutes later, Officer Angel Diaz (hereinafter "Officer Diaz") of the City of Harrisburg Police Department responded to 1935 Brookwood Street. Upon arriving, he observed a green sedan parked at an awkward angle and in contact with the vehicle behind it. Initially, Officer Diaz believed the vehicle was empty and noticed a male further up the street knocking on a door. Officer Diaz approached and asked if he saw anything, the male responded no. When Officer Diaz re-approached the green sedan, he noticed there was a male in the driver's seat slightly reclined and bleeding from the face. The male was unresponsive. Officer Diaz noted that all the car doors were closed, the car was in drive and running.

When other officers arrived on scene, Officer Diaz requested another officer [to] locate the male he saw knocking on the door. That individual was subsequently identified as Mr. McKinnon. After the victim was removed from the vehicle by emergency personnel, Officer Diaz observed a black firearm on the driver's side floorboard. Officer Diaz secured the gun and noted that it was a Glock 23 .40 caliber loaded with twenty (20) live rounds and one (1) round chambered. There were no shell casings found inside Mr. Guider's vehicle.

When Investigator Kimmick arrived on scene at approximately 4:20 A.M., the scene was securely blocked off with crime scene tape. He observed a Chevrolet Impala crashed into a parked car in front of 1937 Brookwood Street and several items strewn about the road. The tire marks and damage to other vehicles [were] consistent with Mr. Guider's vehicle travelling west on Brookwood Street, striking a pickup truck in front of 2019

Brookwood Street, then rolling back down through the crime scene and coming to a rest in front of 1937 Brookwood Street.

A total of twelve (12) cartridges were collected from the scene on December 31, 2017. Seven (7) of those cartridges came from the same unknown firearm, and the remaining five (5) came from a second unknown firearm. The eleven (11) cartridges collected on December 29, 2017, and the aforementioned seven (7) cartridges from December 31, 2017, came from the same unknown firearm. None of the cartridges collected and tested were from Mr. Guider's firearm.

Detective Iachini was assigned as the lead investigator for the homicide on December 31, 2017. He first interviewed [McKinney's] girlfriend, Erica, and learned about the altercation that occurred between [McKinney] and Mr. Guider on December 27, 2017. After that interview, Detective Iachini identified [McKinney] as a possible suspect. Within the next couple of weeks, he interviewed Ms. Cook, Ms. Washington and Mr. McKinnon. On January 15, 2018, Detective Iachini met with Ms. Goicoechea and showed her a photo array that he had prepared in advance. Ms. Goicoechea subsequently picked [McKinney] from the photo array.

Based upon the description of the shooter's vehicle, Detective Iachini believe it was a rental and checked with Enterprise to find out if [McKinney] had rented any cars from them. [McKinney] rented a pepperdust metallic Chevrolet Impala through Enterprise from December 11, 2017 through January 4, 2018. Detective Iachini was provided the rental agreement and asked the Commonwealth to provide a photograph because he was unsure what pepperdust metallic was. Detective Iachini was provided with a photograph of the exact vehicle on a dealership lot out of state. Thereafter, Detective Iachini went to a local Chevrolet dealer, located a pepperdust metallic Impala and took photographs of it. He testified that the vehicle looks light bronze but could look silver or gray depending on how the sunlight hits it.

Additionally, Detective Iachini provided [McKinney's] cell phone records for 717-315-4708 to Detective James Glucksman (hereinafter "Detective Glucksman") of the Lower Paxton Township Police Department to conduct a historical cell analysis. Detective Glucksman determined that from 11:32 P.M. on

December 30, 2017 to 1:35 A.M. on December 31, 2017, all of [McKinney's] cell phone activity hit off of the two (2) closest towers to the scene of the homicide - Tower 0594 (.430 miles) and Tower 0543 (.460 miles). At 1:28 A.M. on December 31, 2017, the exact time of the 911 call that was placed, [McKinney's] cell phone hit off Tower 0594, which covers the entire scene of the homicide.

Detective Glucksman also reviewed [McKinney's] cell phone activity from December 29, 2017 around 12:00 P.M. when the vehicle Mr. Guider's was driving was shot. As mentioned **supra**, the 911 call came in at 12:22 P.M. Detective Glucksman determined that [McKinney's] cell phone hit off Tower 0084 (.497 miles from 1926 Market Street) at 12:10 P.M. At 12:20 P.M., [McKinney's] cell phone hit Tower 0094 which is located along Interstate 83 near the intersection of East Park Drive and Union Deposit Road.

Trial Court Opinion, 3/30/20, at 4-14 (footnotes, headings, and citations to the record omitted).

At the conclusion of trial, a jury found McKinney guilty of criminal attempt (criminal homicide) at docket CP-22-CR-0001113-2018, but was hung on the homicide and other charges at docket CP-22-CR-0001117-2018. On October 21, 2019, the trial court sentenced McKinney to an aggregate term of ten to twenty years in prison. On December 9, 2019,[2] McKinney filed a timely post-sentence motion, which was denied by the trial court on December

---

[2] Following a procedural history not herein relevant, McKinney failed to file a timely post-sentence motion due to the withdraw of his private counsel and several delays related to the appointment of a public defender. McKinney's post-sentence rights were reinstated *nunc pro tunc*, and he was ordered to file a post-sentence motion no later than December 9, 2019.

30, 2019. McKinney filed a timely notice of appeal. Both McKinney and the trial court complied with Pa.R.A.P. 1925.

McKinney raises the following issues for our review:

1. Was the evidence presented at trial insufficient to sustain a verdict of guilt where the majority of the Commonwealth's case was circumstantial, there was no evidence that the alleged victim was in or near the target vehicle at the time of the shooting, and there was insufficient evidence to prove that [McKinney] was the shooter?

2. Whether the trial court erred by allowing the Commonwealth to elicit testimony from Erica Smith regarding [McKinney's] incarceration since the offered testimony was irrelevant and any purported probative value was far outweighed by the prejudice caused to [McKinney] the Commonwealth [*sic*] to elicit testimony regarding [McKinney's] incarceration for the attempt [*sic*] homicide and homicide charges?

3. Whether the trial court erred by allowing the Commonwealth to introduce a photograph of a "pepperdust metallic" vehicle in order to identify the vehicle purportedly driven by [McKinney] during that timeframe even though the picture was not a fair and accurate depiction of the actual vehicle driven by [McKinney] and the photograph of a vehicle that was not specifically identified as the actual vehicle used in the shooting?

4. Did the trial court err by failing to grant [McKinney] a new trial on the basis that the jury's verdict was against the weight of the evidence; the Commonwealth's case was purely circumstantial, only one Commonwealth witness identified [McKinney] after giving police an incorrect description of him, and there was no evidence that the alleged victim was near or in the vehicle which was the target of the shooting at the time the incident occurred?

McKinney's Brief at 6 (issues reordered for ease of disposition).

McKinney's first issue presents a challenge to the sufficiency of the evidence. However, the trial court determined that the issue was waived.

- 9 -

Thus, prior to analyzing the merits of McKinney's sufficiency claim, we must first determine whether he preserved it for our review.

In **Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998), our Supreme Court held that if an appellant is directed to file a concise statement of errors to be raised on appeal pursuant to Pa.R.A.P. 1925(b), "[a]ny issues not raised in a 1925(b) statement will be deemed waived." **See also** Pa.R.A.P. 1925(b)(3)(vii) (stating that "issues not included in the Statement . . . are waived."). Since **Lord**, our appellate courts have ruled that, in order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. **See Commonwealth v. Gibbs**, 981 A.2d 274, 281 (Pa. Super. 2009).

Here, the trial court directed McKinney to file a concise statement of errors to be raised on appeal pursuant to Pa.R.A.P. 1925(b). In his Pa.R.A.P. 1925(b) statement, McKinney framed his sufficiency claim as follows: "[t]he evidence presented at trial was insufficient to sustain a verdict of guilt. The only evidence presented at trial was the questionable testimony of Commonwealth witnesses, only one of whom identified [McKinney] as the shooter, but only after two weeks had passed." Concise Statement at 2. Again, the trial court concluded that that McKinney's sufficiency challenge was waived because he failed to specify the element or elements upon which he

believed the evidence was insufficient in the Pa.R.A.P. 1925(b) statement. **See** Trial Court Opinion, 3/30/20, at 15.[3]

Clearly, McKinney's Pa.R.A.P. 1925(b) statement does not challenge the sufficiency of the Commonwealth's evidence regarding any specific element of the singular crime for which he was convicted, *i.e.*, criminal attempt (homicide). Thus, his bald assertion that "[t]he evidence presented at trial was insufficient to sustain a verdict of guilt," is inadequate to raise a sufficiency claim on appeal.

While McKinney does endeavor to present a challenge to the Commonwealth's evidence identifying him as the shooter, the issue, as framed in his Pa.R.A.P. 1925(b) statement, is essentially a challenge to the weight of the evidence rather than to the sufficiency of the evidence. In his Pa.R.A.P. 1925(b) statement, McKinney acknowledges that the Commonwealth presented identification evidence though the testimony of one witness, but implicitly seeks that we reassess the credibility of that witness because the identification was "questionable," and provided "after two weeks had passed." Such an assessment is beyond our purview in the context of a challenge to the sufficiency of the evidence. **See Commonwealth v. Moyer**, 171 A.3d 849, 852 (Pa. Super. 2017); **see also Commonwealth v. Wilson**, 825 A.2d 710, 713-14 (Pa. Super. 2003).

_____

[3] The Commonwealth also contends that McKinney's sufficiency challenge is waived for lack of specificity in the Pa.R.A.P. 1925(b) statement.

Any uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency. ***See Commonwealth v. Cain***, 906 A.2d 1242, 1245 (Pa. Super. 2006); ***see also Commonwealth v. Miller***, 172 A.3d 632, 643 (Pa. Super. 2017) (holding that a "true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed."). As McKinney has raised a separate challenge to the weight of the evidence in which he addresses, *inter alia*, the reliability of the Commonwealth's identification testimony, we will address this argument in our analysis of McKinney's separate weight challenge, ***infra***.[4]

In his second issue, McKinney contends that the trial court abused its discretion by permitting the Commonwealth to elicit testimony from Erica Smith referencing his incarceration. Our standard of review is as follows:

> The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

***Commonwealth v. Benvenisti-Zarom***, 229 A.3d 14, 25 (Pa. Super. 2020) (citation omitted).

---

[4] While McKinney attempts to raise other sufficiency claims in his appellate brief, we will not consider them, as he did not preserve them for our review by including them in his Pa.R.A.P. 1925(b) statement.

Further, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

McKinney maintains that, during trial, the prosecutor questioned Smith about McKinney's telephone number and whether she knew that number had changed following the homicide of Guider. The exchange in question consisted of the following:

> [The Prosecutor]: Yet you're telling us that in January of 2018 you weren't aware that [McKinney] changed his phone number approximately three days after the homicide. Is that your testimony?
>
> [Smith]: Correct. I used the same number the entire, like, time.
>
> [The Prosecutor]: Okay. So Sprint would be wrong? Are you saying that you continued to utilize that phone number calling him in January, February, and March of 2018.
>
> [Smith]: He didn't have a phone then. He was already incarcerated at that time.
>
> [The Prosecutor]: We'll talk about - And he was incarcerated on these charges, correct? He got arrested on these charges and obviously didn't have a cell phone?
>
> [Defense Counsel]: Objection, Your Honor. May we approach?
>
> (The following discussion was held on the record at sidebar.)

- 13 -

The Court: Your objection being?

[Defense Counsel]: We do everything that we can to make sure every defendant has due process and keep out his arrest. And here we have the Commonwealth highlighting that.

[The Prosecutor]: I didn't highlight anything.

The Court: We try to make sure that there's no evidence that he's incarcerated during the course of the trial. If someone is arrested on a homicide charge, I think most people would conclude there would be some period of incarceration until bail was posted if that happens. So your client's girlfriend stated that he was incarcerated. [The Commonwealth was] just trying to make it clear that it was this and not something else. You're not planning on going any further?

[The Prosecutor]: No.

[Defense Counsel]: I note my objection for the record.

The Court. And you have an exception on the record. And I ask that it not be emphasized any further.

N.T., 8/13/19, at 107-09.

McKinney argues that the Commonwealth intentionally sought testimony from Smith regarding his incarceration. McKinney asserts that the prosecutor was aware that police arrested McKinney on January 24, 2018, and thereafter held him without bail due to the homicide charge. Nevertheless, the prosecutor asked Smith what phone number she would use to call McKinney in January, February and March of 2018, knowing that McKinney was incarcerated for two thirds of the timeframe in his question. McKinney contends that there was no way Smith's answer would have been anything other than McKinney was incarcerated during that time or that Smith would

- 14 -

have to call him at Dauphin County Prison. McKinney argues that the prejudicial impact of Smith's testimony far outweighed its probative value. He additionally claims that the prosecutor's intentional solicitation of this testimony was possibly the "tipping point" for the jury on the attempted homicide charge, given that the evidence in the case was circumstantial and the jury was hung on the homicide charge. Finally, McKinney claims that the trail court abused its discretion in failing to provide a curative instruction to the jury.

The trial court considered McKinney's second issue and concluded that it lacked merit. The trial court reasoned:

> The reference to [McKinney's] incarceration was clearly inadvertent and not initially elicited by the Commonwealth. Once [McKinney's] girlfriend mentioned his incarceration, the Commonwealth wanted to clarify that she was **not** referencing a prior incarceration. Additionally, as this [c]ourt aptly stated at trial, most people would assume that an individual charged with homicide is incarcerated. Accordingly, this [c]ourt did not err in overruling [McKinney's] objection to testimony that [he] was incarcerated because defense counsel requested no further relief.

Trial Court Opinion, 3/30/20, at 20 (emphasis in original). The trial court additionally noted that, although defense counsel made a timely objection to the references to McKinney's incarceration, he did not ask for a mistrial. ***See Id***. at 19.

We discern no abuse of discretion by the trial court in its evidentiary ruling. Although generally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a ***previous*** crime, there is no

- 15 -

rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the **pending** charges. **See Commonwealth v. Johnson**, 838 A.2d 663, 680 (Pa. 2003). Nevertheless, our courts recognize that "constant reminders" of a defendant's incarceration may affect the jury's judgment and burden the defendant's right to the presumption of innocence. **Id**. at 681 (citing **Estelle v. Williams**, 425 U.S. 501 (1976)).

Here, the reference to McKinney's incarcerated status was passing, and not the type of "constant reminder" proscribed by **Estelle**. Moreover, the prosecutor confirmed with Smith that the incarceration she referenced was for the pending homicide charges, rather than an unrelated prior offense. **See Johnson**, 838 A.2d at 680; **see also Commonwealth v. Wilson**, 649 A.2d 435, 445-46 (Pa. 1994) (concluding that testimony indicating that the defendant was incarcerated prior to trial was not improper where the jury could reasonably infer that the defendant's detention was the result of the criminal acts for which the defendant was on trial); **Commonwealth v. Horne**, 89 A.3d 277, 284 (Pa. Super. 2014) (explaining that the brief mention of the defendant's incarceration did not unduly prejudice him, as the jury could reasonably infer that he was incarcerated prior to trial because he was accused of committing the robbery at issue, not some previous offense). Moreover, defense counsel did not request either a mistrial or a curative instruction. Thus, McKinney cannot now fault the trial court for failing to provide relief that

he never requested. For these reasons, McKinney's second issue merits no relief.

In his third issue, McKinney contends that the trial court abused its discretion by permitting the Commonwealth to introduce a photograph of a vehicle purporting to be the same color as the vehicle McKinney was allegedly driving on December 29, 2017. We employ the same standard of review as indicated above regarding the admission of evidence.

McKinney argues that the trial court abused its discretion by permitting the Commonwealth to introduce a photograph of a 2018 Chevy Impala, purporting to be pepperdust metallic in color. McKinney points out that the vehicle in the photograph was not the actual vehicle that he rented and drove. While McKinney concedes that photo may be relevant, he argues that the possibility that the photo could mislead or confuse the jury outweighed any probative value. McKinney posits that, when the Commonwealth presents a photograph of a vehicle that matches the description of one supposedly used in a shooting, the jury will accept that photograph as the exact replica of the vehicle in question and will believe that the color presented in the photograph is the same color as that of the actual vehicle.

McKinney points out that the Commonwealth had a photograph of the actual vehicle McKinney rented, but did not want to expend the cost of bringing a witness from out-of-state to authenticate that photograph. Thus, McKinney argues, he was forced to stipulate to the photo of the actual vehicle

in order to cross-examine Detective Iachini regarding the model and color of the vehicle. McKinney argues that, despite the stipulation by the defense to the photograph of the actual vehicle he drove, the Commonwealth still chose to present photographs of a vehicle that was not the vehicle in question. Thus, he argues that "it seems clear that the Commonwealth was not introducing the photo[s] of the miscellaneous Chevy Impala for the purposes of confusing or misleading the jury, not to fairly and accurately represent the actual vehicle driven by McKinney." McKinney's Brief at 29.

As with other evidence, a trial court has discretion to admit demonstrative evidence, such as a photograph, if its relevance outweighs any potential prejudice effect. *Commonwealth v. Reid*, 811 A.2d 530, 552 (Pa. 2002). Demonstrative evidence, however, must also be properly authenticated by evidence sufficient to show that it is a fair and accurate representation of what it is purported to depict. *Id*. (*citing* Pa.R.E. 901(a)). Demonstrative evidence may be authenticated by testimony from a witness who has knowledge of what the evidence is proclaimed to be. *Id*. (citing Pa.R.E. 901(b)(1)).

Here, the color of the vehicle that the shooter was driving on December 29, 2017, was in dispute. Ms. Goicoechea testified that the shooter drove a brown Chevrolet Impala. *See* N.T., 8/12/19, at 48, 74. On the other hand, Ms. Smith told police that the shooter's vehicle was blue or gray. *See id*. at 44. The Commonwealth established that, from December 11, 2017 through

January 4, 2018, McKinney rented a 2018 Chevrolet Impala, which was pepperdust metallic in color. *See* N.T., 8/13/19, at 228, 230. Thus, the color of the rental vehicle was clearly relevant to the question of whether McKinney was the shooter on December 29, 2017.

At trial, Detective Iachini testified that, as part of his investigation, he went to a local Chevrolet dealership to find a 2018 pepperdust metallic Chevrolet Impala. N.T., 8/14/19, at 456, 460. He further testified that, upon locating such a vehicle, he took photographs of that vehicle. *Id*. at 460. The prosecutor then showed Detective Iachini two photographs, and the detective confirmed that they were the photographs that he had taken of the 2018 pepperdust metallic Chevrolet Impala at the local Chevrolet dealership. *Id*. Detective Iachini testified that, while pepperdust metallic looked like a light bronze color to him, depending on how the sun hits it, pepperdust metallic could also look silver or gray. *Id*. at 460-61.

We discern no abuse of discretion by the trial court in admitting the demonstrative photographs of a pepperdust metallic 2018 Chevrolet Impala. In its view, the relevance of the photographs to show the color of the vehicle that McKinney was driving on December 29, 2017, outweighed any potential prejudicial effect. *See Reid*, 811 A.2d at 552. The rental agreement was admitted into evidence and specified that McKinney had rented a 2018 Chevrolet Impala that was pepperdust metallic in color. Detective Iachini authenticated the photographs by testifying that they were the photographs

that he had taken of a pepperdust metallic 2018 Chevrolet Impala at a local dealership. McKinney stipulated to the admission of a photograph of the actual pepperdust metallic 2018 Chevrolet Impala that McKinney rented; however, he does not claim that color varied between the two vehicles depicted in the photographs such that the jury could be misled or confused. Nor does McKinney explain how he was in any way prejudiced by the admission of the two photographs taken by Detective Iachini. Thus, his third claim warrants no relief.[5]

In his final issue, McKinney contends that the verdict of guilt was against the weight of the evidence. The following legal principles apply when a challenge to the weight of the evidence supporting a conviction is presented to the trial court:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and

---

[5] The trial court concluded that McKinney's third issue was waived because defense counsel stipulated to the admission of the photograph of the actual vehicle that McKinney rented. *See* Trial Court Opinion, 3/30/20, at 20-21. However, on appeal, McKinney's challenges the admission of the demonstrative photographs taken by Detective Iachini of the 2018 pepperdust metallic Chevy Impala. We cannot agree that defense counsel's stipulation to a different photograph constitutes waiver of his challenge to the photographs here in question.

allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Commonwealth v. Widmer***, 744 A.2d 745, 751-52 (Pa. 2000) (citations, footnotes and quotation marks omitted). Thus, to allow an appellant "to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court." ***Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa. Super. 2016) (internal citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> **Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*.** Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis in original, internal citations omitted).

McKinney argues that the verdict was against the weight of the evidence because the Commonwealth's case was purely circumstantial. McKinney points out that only one Commonwealth witness identified him in a photo array two weeks after giving police an incorrect description of him. Further, McKinney avers that there was no evidence that Guider was in the vehicle which was the target of the shooting at the time the incident occurred. McKinney maintains that although Guider told Morrison that her vehicle had been shot up, there was no testimony that he told her that he was in the vehicle at the time of the shooting.

McKinney also points to the inconsistencies in Goicocchea's testimony. Goicocchea identified the shooter as no more than five feet, seven inches; however, McKinney was identified as being six feet, four inches. McKinney claims that Goicocchea erroneously testified that she only spoke to police when they came to her door, and gave the impression during trial that she did not call the police or desire to speak with them. McKinney argues that her testimony was contradicted by Officer Kreiser, who indicated that when she arrived at the scene of the shooting, Goicocchea was outside her house and flagged Officer Kreiser down in order to give a statement. McKinney claims that Goicocchea also testified that the victim's vehicle was a black Chevy Malibu, but the actual car that sustained damage during the shooting was a Kia Optima.

The trial court considered McKinney's weight challenge and concluded that the verdict of guilt did not shock its conscience. The trial court reasoned:

> In the present case, the weight of the evidence supports the jury's findings. . . . [T]he evidence overwhelmingly demonstrates that [McKinney] had a specific intent to kill Mr. Guider, took substantial steps in completing that goal on December 29, 2017, and ultimately succeeded on December 31, 2017. There is an eyewitness to the shooting on December 29, 2017, who was able to identify [McKinney] in a photo array, as well as in-court during trial. Furthermore, Ms. Morrison testified that Mr. Guider was driving her vehicle on December 29, 2017, when it was shot at, and ultimately provided her vehicle to police to process for evidence. Accordingly, the verdict was not contrary to the weight of the evidence to the degree of shocking one's conscience. Therefore, this [c]ourt did not err in denying [McKinney's] post-sentence motion for a new trial based on a challenge to the weight of the evidence.

Trial Court Opinion, 3/30/20, at 18-19.

As discussed above, we give the gravest consideration to the findings and reasons advanced by the trial court when reviewing its determination that the verdict is not against the weight of the evidence. In this matter, we discern no abuse of discretion by the trial court in arriving at its determination that the verdict of guilt for criminal attempt (homicide) did not shock its conscious. Although the evidence of McKinney's guilt was largely circumstantial, it was nevertheless overwhelming. Accordingly, McKinney's weight challenge merits no relief.

As none of McKinney's issues entitles him to relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>03/31/2021</u>