**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                  :                 PENNSYLVANIA
                                  :
             v.                      :
                                  :
                                  :
CHRISTOPHER JOHN DONAFRIO : 
                                  :
            Appellant       :     No. 1279 WDA 2022

Appeal from the Judgment of Sentence Entered May 24, 2022
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s): CP-37-CR-0000758-2020

BEFORE: PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                 **FILED: May 18, 2023**

Christopher John Donafrio (Donafrio) appeals from the judgment of sentence of 6½ to 15 years' imprisonment imposed by the Court of Common Pleas of Lawrence County (trial court) after a jury convicted him of possession with intent to deliver (PWID), simple possession and drug paraphernalia.[1] On appeal, he challenges the sufficiency and weight of the evidence for his convictions and the trial court's denial of his motion to suppress. We affirm.

**I.**

On September 26, 2020, at around 12:30 p.m., two officers from the Shenango Township Police Department were dispatched for a reported

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. §§ 780-113(a)(30), (16) and (32).

domestic disturbance at Room 111 of the El Dorado Motel in New Castle. According to the hotel manager who called 911, a man and a woman were going in and out of the room multiple times and arguing with each other. The hotel manager also reported that the room was registered to a female named Heather Fullwood (Fullwood).

When they arrived at the motel, the officers saw Donafrio walk out of Room 111. The officers walked over to him and explained why they were there. Donafrio gave the officers his identification and told them that he had been in the room with Fullwood, his longtime girlfriend. Donafrio also told them that they had been fighting and that there was drug paraphernalia in the room and that he wanted to leave. The officers then went and talked to Fullwood in the room's doorway. She told the officers that she and Donafrio were arguing because he constantly cheats on her. She also told them that she wanted to leave but Donafrio had her car keys and cell phone. The officers went back and told Donafrio what Fullwood wanted. He responded that he wanted his items out of the room. The officers returned and told Fullwood what Donafrio wanted. Fullwood told them that she did not know where the items were but that they could come in and search for them.

Upon entering the room, the officers saw that the room was in disarray. While searching for Donafrio's items, the officers saw several items of drug paraphernalia—hypodermic needles, glass vials with residue, clear plastic baggies and a scale. When the officers found a clear plastic baggie containing

a large amount of suspected cocaine, the officers stopped the search so that they could get a search warrant. After obtaining the warrant, police searched the room and found, among other things, a baggie containing .94 grams of heroin, fentanyl and tramadol. The police also found multiple units of Narcan, as well as male and female clothing and a prescription pill bottle with the name partially written as "Christopher J."[2]

Donafrio and Fullwood were placed under arrest and searched, as Donafrio was found to have had on him two cell phones and Fullwood's wallet. Donafrio and Fullwood were then taken to the police station. While Fullwood was waiting in an interview room, an officer saw her unbutton her pants and reach into her crotch area. As a result, the officer called for a female officer to conduct a strip search of Fullwood. During that search, the officer saw a baggie in Fullwood's underwear. Fullwood removed the baggie and gave it to the officer, at which point the officer stopped searching Fullwood. Drug testing later revealed that the baggie contained 3.86 grams of heroin, fentanyl and tramadol.

While at the station, Donafrio complained that he was having a panic attack. EMS personnel responded and determined that he needed to go to

---

[2] The officers also towed Donafrio and Fullwood's car and searched it after obtaining a search warrant based on a canine search. Inside the car, the police found a digital scale, a locked safe and clear plastic baggies containing smaller amounts of suspected drugs.

the hospital along with Fullwood, who appeared under the influence of drugs. Both Donafrio and Fullwood were taken to the hospital and evaluated before being discharged a few hours later. Once they were done, two officers drove them back in a police cruiser. Fullwood was seated behind the driver while Donafrio was in the rear passenger seat, and both had their hands cuffed in front of them. As soon as they left, the officer driving noticed in the rearview mirror that Fullwood was leaning toward Donafrio with their heads almost touching and that they were seated very close to each other. The officer also saw that there was a lot of movement. When they arrived back at the police station, the officer in the passenger seat took Donafrio into the station while the officer driving took Fullwood. As he opened the rear driver door, the officer saw two bags of suspected drugs—one on the floor at Fullwood's feet and the other between her and the door. The officer also saw that Fullwood's pants were completely open with her button undone and the zipper all the way down. The two bags of suspected narcotics were determined to contain 26.92 and 9.8 grams of heroin, fentanyl and tramadol.

That same day, Detective Richard Ryhal was called to the police station to interview Donafrio, who waived his *Miranda* rights.[3] At first, Donafrio stated that he did not know what the substances were that the police found.

---

[3] *See generally Miranda v. Arizona*, 384 U.S. 436 (1966) (an accused subject to custodial interrogation must be advised of the constitutional right to remain silent and the right to a lawyer).

An hour later, however, Donafrio told the detective that he had been "fronted" the drugs and that he owed $2,400 for the controlled substances that had been found.

Before trial, Donafrio filed a petition for writ of habeas corpus, claiming that the Commonwealth lacked sufficient evidence to establish a *prima facie* case for its charges. After his petition was denied, Donafrio filed a motion to suppress the controlled substances seized and his statements to the police, asserting that the police illegally arrested him when they first arrived at the motel and questioned him without giving him his **Miranda** rights. The trial court held a hearing on the suppression motion in June 2021 and denied the motion a few months later in September 2021.

Donafrio eventually proceeded to trial in March 2022. At trial, the Commonwealth qualified Detective Ryhal as an expert in narcotics investigations. As the trial court summarized his testimony:

> Detective Ryhal explained daily usage for heroin or fentanyl would be approximately half of a gram to a gram and a half. He indicated individuals frequently both sell and use drugs on a daily basis to help maintain their addiction. Individuals who are in possession of drugs as a user typically have smaller amounts, low amounts of cash and items used to ingest the drugs. Items like syringes, straws, spoons, lighters, Q-tips and cotton balls are used to ingest heroin and fentanyl. Detective Ryhal then explained law enforcement look to the totality of the circumstances to determine whether to charge an individual with possession with intent to deliver and they consider the following factors: "where the individuals may be located at, the amount, obviously, other things as far as what type of currency they have, the denominations of the currency, multiple cellular phones, things of that such." They also factor in whether there are weighing scales and packaging materials such as baggies or paper folds.

Detective Ryhal explained cutting agents are substances added to controlled substances used to add weight or to dilute the potency of those drugs. On many occasions, powder substances are used as cutting agents such as over the counter medications, sleeping medications and sugar. According to Detective Ryhal, a cutting agent is a sign of possession with intent to deliver as drug users will often just ingest a smaller dosage as opposed to adding a cutting agent to the controlled substances. He also explained the presence of Narcan may indicate possession with intent to deliver as heroin and fentanyl can be absorbed through the skin and those trafficking substances of that nature keep Narcan present in case they accidentally overdose during the packaging process. In some instances, drug dealers will allow the person purchasing the drugs to sample them to determine the potency of the substance, so they keep Narcan present in the event that person overdoses.

* * *

Moreover, Detective Ryhal opined those substances recovered during the investigation, which did not test positive for the presence of controlled substances, were cutting agents due to the manner in which they were packaged. Resultantly, it was Detective Ryhal's opinion the amount of controlled substances present along with the presence of cutting agents indicated the controlled substances were being packaged for selling. Additionally, there were a large number of plastic baggies throughout Room 111, there were five cell phones present with two cell phones discovered in Donafrio's possession, there were a large number of syringes, spoons and straws, multiple scales, multiple units of Narcan, which, according to Detective Ryhal, indicated Donafrio possessed controlled substances with the intent to deliver. Detective Ryhal also considered that Room 111 was registered to Ms. Fullwood and the controlled substances discovered on the floor of Corporal Lough's vehicle were located where she was seated when making his determination. However, he explained drug dealers commonly have females transport controlled substances as there are fewer female police officers to search them, the male is commonly the subject of the investigation by law enforcement and females are more readily able to conceal the controlled substances.

Trial Court Opinion (TCO), 7-9 (footnote omitted; cleaned up).

At the end of trial, the jury trial found Donafrio guilty of the above offenses. In finding him guilty of PWID, the jury determined that (1) the controlled substances possessed were heroin, fentanyl and tramadol, and (2) the total weight of the controlled substances was 41 grams. At sentencing, Donafrio's standard range guidelines for PWID were 72 – 90 months based on him having a prior record score of five and the offense gravity score (OGS) being 11 because he possessed over ten but less than 50 grams of a controlled substance containing fentanyl.[4] Based on this calculation, the trial court imposed a standard range guideline sentence of 6½ to 15 years' imprisonment for PWID.[5] After his post-sentence motion was denied, Donafrio filed this timely appeal.

## II.

In his first issue, Donafrio challenges the sufficiency of the evidence for his PWID and drug paraphernalia convictions.[6] The offenses of PWID and possession of drug paraphernalia are defined by statute as follows:

---

[4] *See* 204 Pa. Code § 303.15 (offense listing; 7th ed., amend. 5).

[5] As for Donafrio's other convictions, the trial court merged simple possession with PWID and imposed a concurrent sentence for drug paraphernalia.

[6] Our standard of review for a sufficiency challenge is well-settled.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

* * *

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

* * *

(32) The use of, or possession with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act.

---

a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding [Donafrio's] guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered.  Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Williams***, 255 A.3d 565, 578-79 (Pa. Super. 2021) (citation omitted).

35 P.S. §§ 780-113(a)(30), (32).

To establish the offense of PWID, the Commonwealth must prove beyond a reasonable doubt that the Donafrio possessed a controlled substance with intent to deliver. *See Commonwealth v. Jones*, 874 A.2d 108, 121 (Pa. Super. 2005). "[A]ll of the facts and circumstances surrounding the possession are relevant and the elements of the crime may be established by circumstantial evidence." *Commonwealth v. Little*, 879 A.2d 293, 297 (Pa. Super. 2005).

Possession can be established "by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa. Super. 2018) (citation omitted). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not." *Commonwealth v. McClellan*, 178 A.3d 874, 878 (Pa. Super. 2018) (citation omitted).

This Court has explained:

Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish

- 9 -

facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

**Parrish**, 191 A.3d at 36-37 (citations omitted and formatting altered).

"[T]he power and intent to control the contraband does not need to be exclusive to the defendant. Our Supreme Court has recognized that 'constructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access.' " **Commonwealth v. Rojas-Rolon**, 256 A.3d 432, 438 (Pa. Super. 2021) (citation omitted). This Court, however, has stated that "knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession." **Commonwealth v. Wright**, 255 A.3d 542, 553 (Pa. Super. 2021) (citations omitted).

Under the trial court's special interrogatories for PWID, the jury convicted Donafrio of PWID of 41 total grams of heroin, fentanyl and tramadol. The 41 grams were found in three locations: (1) inside the motel room (.94 grams), (2) on Fullwood (3.86 grams), or (3) in the backseat of the police cruiser (two baggies totaling 36.76 grams). As discussed, the OGS for PWID was calculated based on Donafrio possessing at least ten grams of "fentanyl and its derivatives and analogues." Thus, even if we found there was insufficient evidence that he constructively possessed the drugs found in the motel room or on Fullwood, we would not disturb his PWID conviction unless

there was insufficient evidence that he constructively possessed the 36.76 grams found in the backseat of the police cruiser.[7]

Addressing the drugs in the backseat, Donafrio asserts that the only reasonable inference is that Fullwood had the bags on her the entire time she was at the hospital and then tried to remove them when she was in the backseat of the cruiser. Even if he knew about the drugs, Donafrio argues, he had no ability to exercise any control over those items because he was handcuffed and strapped into the rear passenger side of the police cruiser. He, thus, contends that the Commonwealth's theory of joint or constructive possession was based solely on his relationship with Fullwood.

At trial, the Commonwealth called both the officer who drove the cruiser, Corporal David Lough, and the officer in the passenger seat, Officer Vincent Buonpane. First, Corporal Lough testified that he checked the backseat when he first got to the station and did not find anything in it before he went to go pick up Donafrio and Fullwood at the hospital. **See** Notes of Jury Trial (N.T.), 3/15/22, at 125. When asked what he saw while driving Donofrio and Fullwood back to the police station, Corpora Lough answered that he "observed Miss Fullwood leaning way over toward Mr. Donafrio. Their heads

_____

[7] **See**, **e.g.**, **Commonwealth v. Risoldi**, 238 A.3d 434, 456 (Pa. Super. 2020) (affirming defendant's conviction for theft by deception in a 2.75 million dollar insurance fraud scheme where there was insufficient evidence for part of the conviction but the jury's verdict encompassed other items not challenged by defendant).

were almost touching. That's how close they were." *Id*. at 126. Corporal Lough continued:

Well, I mean, she was leaning way over like into his part of the seat area. Like I said, it's not a big back-seat area. There's not a lot of room, but, I mean, she was like leaning way over that their heads were almost touching, and there was a lot of movement that I was able to witness that. That's what caught my attention was her moving around a lot.

*Id*. at 127. Officer Buonpane gave a similar account, testifying that when he turned around in the cruiser to see what was going on, he saw that Donafrio and Fullwood were "within a few inches of each other at that point, maybe had even been in contact with each other." *Id*. at 116.

Second, at trial, the Commonwealth qualified Detective Ryhal as an expert in narcotics investigations. *See* N.T., 3/16/22, at 25. As part of its examination, the Commonwealth asked Detective Ryhal the following:

Q: Now, you're familiar with the evidence in this case and where the narcotics were located?

A: Yes.

Q: The hotel room, Miss Fullwood, and the back of the cruiser on Miss Fullwood's side of the vehicle?

A: Yes.

Q: What else are you taking into account between the parties?

A: It was my understanding that Mr. Donafrio and Miss Fullwood were a couple at the time, and what will usually be done as well with trafficking or transporting illegal narcotics or concealing them, they will -- a drug dealer will most likely have a female carry it because a female is less likely to be searched. There's less female police officers and the male is usually the subject of the investigation. And also, females can more readily or easily

- 12 -

conceal items than a male could, and all -- and the items that were located in the vehicle all tie back to the motel room based on the digital weigh scales, the packaging materials, the usage of the syringes and all that.

Q: And in conjunction with the statements made by Mr. Donafrio himself?

A: Yes, absolutely.

*Id*. 51-52.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find that there was sufficient evidence for the jury to find that Donofrio constructively possessed the two bags of drugs found in the backseat after he and Fullwood were brought back to the police station. First, as Detective Ryhal's testimony highlights, the jury was not required to view the evidence recovered in the backseat in a vacuum. Instead, the jury was free to consider the totality of the circumstances through all the evidence of the investigation leading to that point. As the trial court summarized this evidence as it relates to Donafrio's challenge:

It is apparent the Commonwealth presented sufficient evidence for the jury to determine Donafrio was in constructive possession of the controlled substances. First, he was observed exiting Room 111 and was seen frequently entering and exiting that room leading up to the domestic disturbance. In fact, Donafrio had possessions still inside of Room 111 when Officer Tressler and Officer Hill arrived. Donafrio was also aware of the drug paraphernalia present in Room 111 based upon his statement to the police officers. In addition, the execution of the search warrant revealed the presence of male and female clothing in Room 111 and a prescription pill bottle for "Christopher J." In regards to the controlled substances discovered in Corporal Lough's vehicle, Ms. Fullwood was strip searched prior to being transported to the hospital and controlled substances were seized

from her person at that time. When Donafrio and Ms. Fullwood were being transported in Corporal Lough's vehicle, they moved closer to each other with their heads almost touching. Ms. Fullwood was observed with her pants unbuttoned and there were two baggies of controlled substances discovered on the floor where she was seated. Both individuals were handcuffed in front of them, so they would have been able to pass items back and forth to each other and Donafrio also as not strip searched prior to being transported to the hospital. Donafrio also admitted to Detective Ryhal he owed $2,400.00 for the controlled substances seized by police officers. The Commonwealth presented ample evidence Donafrio could have exercised dominion or control over the controlled substances and drug paraphernalia seized during this investigation.

TCO at 18-19 (cleaned up).

We agree with the analysis but would add that whether Donafrio or Fullwood had the drugs on them when they entered the police cruiser is not determinative of our inquiry. Based on all the evidence, the jury could conclude either that Donafrio had the drugs and tried to pass them to Fullwood or that Fullwood had the drugs and Donafrio moved closer to help her discard them or pass them to him. Under either scenario, the jury did not need to ignore the officers' testimony that Donafrio and Fullwood moved closer together and that there was a lot of movement while they were seated next to each other. From this evidence, the jury could infer that Donafrio—who later admitted that all the drugs were fronted to him—constructively possessed the drugs found on the floor, that is, he had conscious dominion over the baggies because he had the power to control the contraband and the intent to exercise that control. **See Parrish**, **supra**. Thus, viewing the evidence in the light most favorable to the Commonwealth, we find there was

- 14 -

sufficient evidence that Donafrio constructively possessed the 36.76 grams of heroin, fentanyl and tramadol found in the backseat of the police cruiser. In so finding, we need not address the sufficiency of the evidence for the remaining drugs seized.

Finally, we also find that there was sufficient evidence for the jury to convict Donafrio of constructively possessing the drug paraphernalia found in the motel room. Multiple persons may constructively possess contraband if it is found in an area of joint control and equal access. *Id.* In *Commonwealth v. Murdick*, 507 A.2d 1212 (Pa. 1986), the defendant was convicted of PWID for drugs found in the bedroom he shared with his wife. After we reversed his convictions, our Supreme Court found that this type of possession could be established if multiple actors exercise dominion over the area. *Id*. at 1214. The Court reinstated his convictions for possession and PWID, concluding that "even absent a marital relationship[,] constructive possession may be found in either or both actors if contraband is found in an area of joint control and equal access." *Id.*; *see also Commonwealth v. Macolino*, 469 A.2d 132, 134-35 (Pa. 1983).

Like *Murdick*, the jury could conclude that Donafrio and Fullwood had equal access to the motel room and the drug paraphernalia found in it. The hotel manager reported that a man and a woman—presumably Donafrio and Fullwood—were going in and out of the room. When the police arrived, Donafrio admitted to the police that he was just in the motel room and that

there was drug paraphernalia in it. The Commonwealth also presented evidence that Donafrio's belongings—including a pill bottle with his name on it—were inside the room, thus raising the inference that he was staying in the room with Fullwood even though it was registered in her name. Under these circumstances, which included Donafrio's eventual admission to being fronted the drugs, the jury had sufficient evidence to convict for possession of drug paraphernalia.

## III.

Donafrio next challenges the weight of the evidence for the jury's verdict.[8] In his argument, Donafrio notes that the Commonwealth never checked if the cell phones and digital scales seized were operational. Donafrio also notes that Detective Ryhal admitted that there were several items found—such as lighters, spoons and syringes—indicating personal use over a period of time. Donafrio further faults Detective Ryhal for assuming that he jointly possessed the controlled substances even though he never actually possessed them. Indeed, Donafrio contends, there was no evidence that he delivered a controlled substance to anyone or discussed doing so with Fullwood. Accordingly, he asserts the jury's verdict is against the weight of the evidence and that he should receive a new trial.

---

[8] Donafrio preserved this challenge by including it in his post-sentence motion. *See* Pa.R.Crim.P. 607(A)(3).

After review, we find no relief due.[9]  As the trial court summarized in rejecting this claim,

> Donafrio conceded he was in Room 111 and was viewed leaving the same.  He also acknowledged to Detective Ryhal he owed $2,400.00 for the controlled substances seized by the police officers.  The police officers provided credible testimony as it pertains to their observations previously set forth in this Opinion and Detective Ryhal's expert testimony credibly explained his rationale for opining Donafrio was guilty of possessing the controlled substances with the intent to deliver.  There is nothing in the testimony and evidence presented at trial which would entitle Donafrio to a new trial.  Hence, the jury's verdict was not against the weight of the evidence and there are no adequate grounds to disturb the jury's verdict in this case.

*Id*. at 20-21 (cleaned up).

We agree with this analysis and find that Donafrio cannot overcome the high standard for overturning a jury's verdict based on the weight of the evidence.  To recap, the Commonwealth presented evidence that Donafrio had

---

[9] Our standard of review for a weight of the evidence claim is as follows:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Horne*, 89 A.3d 277, 285 (Pa. Super. 2014)  (citation omitted).

been in and out of a motel room registered to his longtime girlfriend and containing his belongings. Inside that motel room, the police found not only all kinds of drug paraphernalia, but also .97 grams of heroin, fentanyl and tramadol. Later, when his girlfriend was searched, the police found another 3.86 grams of heroin, fentanyl and tramadol, along with expert testimony explaining that drug dealers often have female companions conceal drugs because they are less likely to be searched. Then, when Donafrio was being transported with his girlfriend, police saw them close together and moving, following which the police found 36.76 grams of heroin, fentanyl and tramadol in the backseat. Finally, after all the evidence had been seized, Donafrio admitted to police that he had been fronted the drugs for an amount that, according to the Commonwealth's expert, was within the range for the street value of the weight of the drugs. **See** N.T., 3/16/22, at 50 (Detective Ryhal testifying that 41 grams for the controlled substances found could be between $2,000-$4,500). Taken all together, we find no error in the trial court, which heard all the evidence, denying Donafrio's motion for a new trial based on the weight of the evidence.

## IV.

For his final two claims, Donafrio contends that the trial court erred in denying his motion to suppress the evidence seized and his statements to the police. While the trial court issued an opinion explaining its reasoning for denying suppression, Donafrio never requested a transcript of the suppression

hearing, nor has one been filed in the certified record. As a result, in his brief,

he attempts to rely on the testimony from the pretrial hearing on the habeas

petition for the facts supporting his suppression argument. However,

> well-settled Pennsylvania law makes clear an appellate court is
> limited to considering only the materials in the certified record
> when resolving an issue. Where the appellant has not made the
> transcript of the proceedings at issue a part of the certified record,
> we have said:
>
> > With regard to missing transcripts, the Rules of Appellate
> > Procedure require an appellant to order and pay for any
> > transcript necessary to permit resolution of the issues raised
> > on appeal. Pa.R.A.P. 1911(a).... When the appellant ... fails
> > to conform to the requirements of Rule 1911, any claims that
> > cannot be resolved in the absence of the necessary transcript
> > or transcripts must be deemed waived for the purpose of
> > appellate review.

*Commonwealth v. Houck*, 102 A.3d 443, 456 (Pa. Super. 2014) (internal

citations omitted).

Under these circumstances, we are unable to review Donafrio's claims

without the transcript, particularly his second claim in which claims that his

statement to Detective Ryhal was involuntary.[10] In that claim, he faults the

trial judge who heard the motion for not making factual findings on the issue

---

[10] Donafrio's first suppression claim is meritless on its face. In his claim, he contends that the police illegally seized the evidence because there was insufficient justification for his detainment when the police first arrived at the motel. However, as discussed, the police found the drugs and paraphernalia in the motel room after Fullwood, the room's registered guest, gave consent to the police search for items that Donafrio requested. *See Commonwealth v. Reid*, 811 A.2d 530, 542 (Pa. 2002). ("A search warrant is not required, however, where a person with the proper authority unequivocally and specifically consents to the search.").

at the time that he issued his denial of the suppression motion. However, in the absence of a transcript of the hearing, we are unable to evaluate whether the Commonwealth presented sufficient evidence showing that Donafrio voluntarily waived Miranda rights in electing to give a statement to Detective Ryhal. As explained, "[w]hen the appellant ... fails to conform to the requirements of Rule 1911, any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review." *Id*. "We are limited to considering only those facts which have been duly certified in the record on appeal." ***Commonwealth v. Osellanie***, 597 A.2d 130, 131 (Pa. Super. 1991). "[I]t is not the responsibility of this [C]ourt to obtain a copy of [a] transcript for the purposes of reviewing the client's claims." ***Id.*** at 132. For these reasons, since we cannot review this issue without reference to the transcript of the suppression hearing, our review is hampered and we must deem the issue waived.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/18/2023</u>